**Edward Eugene MAYS and Traci Bailey Mays, d/b/a/ Pro–Tech Restoration, Appellants**

v.

**Connie PIERCE, Appellee.**

**No. 14–05–00742–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 26, 2006.

Scott C. Lannie, Baytown, for appellants.

Brad Beers, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

Following a bench trial in this breach-of-contract, Deceptive Trade Practices Act (DTPA),[1] and conversion case, the trial court rendered judgment in favor of appellee Connie Pierce, awarding her actual damages of $43,678.50, additional DTPA damages of $43,678.50, attorneys' fees, and pre- and post-judgment interest. Appellants Edward Eugene Mays and Traci Bai-

---

1. *See* TEX. BUS. & COM.CODE ANN. §§ 17.41–.63 (Vernon 2002 & Supp.2006).

ley Mays, d/b/a/ Pro–Tech Restoration ("Pro–Tech") challenge the legal and factual sufficiency of the evidence to support liability and damages.

Because Pierce's allegations do not rise above a breach-of-contract claim, we reverse that part of the judgment awarding Pierce additional DTPA damages, and render judgment that Pierce take nothing on her DTPA claims. Because Pierce presented sufficient evidence to establish her breach-of-contract claim and associated damages, we affirm the remainder of the judgment awarding actual damages, attorneys' fees, and pre- and post-judgment interest.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 6, 2001, Pierce and Edward Mays ("Mays") signed a work order/contract for Pro–Tech to perform work on Pierce's home. The scope of the work was described as "mold & water remediation/restoration of contents & structure." The contract also provided, "It is understood that payment for the above services will be paid from Insurance Company Proceeds and **Pro–Techs** [sic] **name is to be on all checks** ... Billing will be made directly to the Insurance Company, however if payment is not made it will be the responsibility of the insured." (emphasis in original). Pro–Tech then arranged for mold testing. On December 17, 2001, Mays told Pierce, based on the results of the test, her house contained toxic mold,

the mold was dangerous, and she and her daughter had to leave the house "with the clothes on their back[s]," and move into a motel. Pierce and her daughter did so.

By mid-January 2002, Pro–Tech had submitted a bid to Farmers Insurance (Pierce's insurance company) for the costs to remediate and rebuild the house. The bid included a room-by-room "Building Est.," which contained itemized costs of remediation totaling $15,841.81, together with a room-by-room estimate of the costs for reconstruction totaling $9,647.37 before depreciation and $7,142.51 after depreciation.[2] Farmers calculated a net claim of $24,905.50, after depreciation, for the full cost to remediate and reconstruct the house and to conduct post-remediation testing.[3] Pro–Tech sent a facsimile copy of these documents to Michael Pierce.[4] According to the Pierces, this claim was for mold remediation, post-remediation testing, and rebuilding the house. Pro–Tech separately submitted a bid of $12,296.00 for contents remediation, which, according to Farmers's documents, included two months of storage through April 11, 2002. None of the bids estimated costs for packing and removing the contents of the house.

In January and February 2002, Pierce received checks from Farmers in the amounts of $24,905.50, $4,216.00, and $7,940.83. She gave the first two checks totaling $29,121.50 to Pro–Tech and kept the third check.[5] According to Pierce, the

---

2. The rebuilding costs included such items as painting, resetting the range and sink, and floor covering. The remediation costs included such items as an air scrubber, plastic bags for contaminated materials, and hepa vacuuming.

3. Farmers's calculation of the Replacement Cost Value includes $850.00 for post-remediation testing.

4. When Pierce contracted with Mays, she was married to Michael Pierce. During the events giving rise to this law-suit, Pierce was divorced and received the house as part of the settlement.

5. According to a memo from Mays, he did not receive the first two checks until February 14, 2002, by which time "pack-out" was complete and remediation was to begin the following week. Pierce subsequently received addition-

first two checks represented partial payment for the mold remediation of the house, the contents, and the rebuilding of the house, and the third check represented additional rebuilding costs.

In early 2002, Pro–Tech placed toxic warning signs on the exterior of the house and removed carpet, cabinets, sheetrock, appliances, and the air conditioner. Pro–Tech virtually emptied the living area of the house of its contents, moving some items into off-site storage and placing others, such as toilets, bathtubs, appliances, clothing, and household items in the garage. Pro–Tech left the job on March 3, 2002, without rebuilding the house, remediating its contents, or furnishing a post-remediation certificate showing the house had been cleared of mold. No evidence was presented that Pro–Tech informed Pierce it was stopping work on the project at that time. Pro–Tech did not return Pierce's house key until July 2002.

In July 2002, Pierce hired another company to test her house for mold. The test cost $875.00. The results indicated the house still contained toxic mold.[6]

Farmers paid Pierce's living expenses through April 2002. Because her house was still not habitable, Pierce moved her contents from Pro–Tech's off-site storage facility to a different facility in July. She incurred $360.00 in moving expenses and $822.00 in storage fees during the time required to make her house suitable for living. Pierce later discovered some of the property stored off-site had been damaged or destroyed. Pierce testified that she was unable to salvage any of the property Pro–Tech had moved to the garage, and she opined the "fair value" of the damaged or destroyed items in the garage was $8,226.00.[7] Finally, Pierce believed a credit card had been taken from her house or property at some time during the period when Pro–Tech had custody of the house and property. She reported $126.36 of fraudulent charges on the card.

Pierce subsequently sold the home to her former husband for $5,000.00 and sued Pro–Tech, alleging breach of contract, misrepresentations and unconscionable actions under the DTPA, and conversion based on unauthorized use of the credit card.

Trial was to the bench. Mays testified Pro–Tech was paid for remediation and was never paid to rebuild the house or remediate its contents.[8] He further testified that, if Pro–Tech had been paid to restore the contents and structure, it would have done so.

The trial court rendered judgment in favor of Pierce, awarding her actual damages of $43,678.50, additional DTPA damages of $43.678.50, attorneys' fees, and pre- and post-judgment interest. Pro–Tech filed a motion for new trial, which was denied by operation of law.[9]

## II. ISSUE PRESENTED

In a single issue, Pro–Tech contends (1) there is no evidence, or alternatively factu-

---

al payments from Farmers for contents that were damaged or could not be remediated.

**6.** At trial, Mays attempted to prove Pierce had not taken steps to prevent the regrowth of mold.

**7.** In contrast, Pierce's former husband identified the damaged or missing property represented by the $8,226.00 total as property which was placed in Pro–Tech's storage facili-

ty, rather than in the garage, and counsel's statements were consistent with Mr. Pierce's testimony.

**8.** Mays represented himself at the bench trial. Traci Mays answered but did not appear at trial. Both parties, represented by counsel, filed a motion for new trial.

**9.** *See* TEX.R. CIV. P. 329b(c).

ally insufficient evidence, to establish liability for Pierce's DTPA claims; (2) the evidence is legally, or alternatively factually, insufficient to support Pierce's breach-of-contract claims; (3) no evidence, or alternatively, factually insufficient evidence, supports the theft/conversion claim; and (4) there is no evidence, or alternatively, factually insufficient evidence, to support any of the damages sought by, or awarded to, Pierce.

### III. STANDARD OF REVIEW

■■■ In a nonjury trial, when no findings of fact or conclusions of law are filed or properly requested, it is implied that the trial court made all the necessary findings to support its judgment. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989); *see Pharo v. Chambers Cty.,* 922 S.W.2d 945, 948 (Tex.1996) (stating that, in a bench trial in which the trial court does not file findings of fact or conclusions of law, appellate courts presume the trial court made all findings in support of its judgment).[10] Nevertheless, because a complete reporter's record is a part of the appellate record in this case, appellants may challenge both the legal and factual sufficiency of the trial court's findings. *See Roberson,* 768 S.W.2d at 281.[11] We apply the same standards of review to these challenges as those applied in review of jury findings. *See id.*

Thus, on appeal, a party may challenge the trial court's implied findings by "insufficient evidence" or "no evidence" points the same as a jury's findings or a trial court's findings of fact. *See Julien v. Baker,* 758 S.W.2d 873, 875 (Tex.App.-Houston [14th Dist.] 1988, writ denied) (citing *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex. 1980)). In resolving no evidence points of error, we consider only that evidence favorable to the judgment and disregard all that which is opposed to it. *Id.* (citing *Int'l Bank, N.A. v. Morales,* 736 S.W.2d 622, 624 (Tex.1987)). However, in reviewing insufficient evidence points, we must consider and weigh all the evidence, including any evidence contrary to the trial court's judgment. *Id.* (citing *Burnett,* 610 S.W.2d at 736; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951)).

### IV. DISCUSSION

### A. Pierce's DTPA Claims

■■■ Pierce alleged both an unconscionable action or course of action in violation of TEX. BUS. & COM.CODE ANN. § 17.50(a)(3) (Vernon 2002) and false, misleading, or deceptive acts or practices in violation of TEX. BUS. & COM.CODE ANN. §§ 17.46(b)(5) and (7) (Vernon 2002). The two claims are distinct,[12] and either basis

---

10. The trial court signed the judgment on April 29, 2005. Twenty-four days later, on May 23, 2005, Pro–Tech filed a request for findings of fact and conclusions of law. A party must file its request for findings of fact and conclusions of law within twenty days after the judgment is signed. TEX.R. CIV. P. 296. Thus, Pro–Tech's request was untimely.

11. After answering, Traci did not appear. "A post-answer 'default' constitutes neither an abandonment of defendant's answer nor an implied confession of any issues thus joined by the defendant's answer. Judgment cannot be entered on the pleadings, but the plaintiff in such a case must offer evidence and prove

his case as in a judgment upon a trial." *Stoner v. Thompson,* 578 S.W.2d 679, 682 (Tex. 1979). In such a situation, the appellate court reviews challenges to the legal and factual sufficiency of the evidence under the familiar standards of review. *See Wallace v. Ramon,* 82 S.W.3d 501, 503 (Tex.App.-San Antonio 2002, no pet.).

12. *Ortiz v. Collins,* No. 14–04–01156–CV, 203 S.W.3d 414, 2006 WL 2382255, at *7 (Tex. App.-Houston [14th Dist.] July 6, 2006, no pet. h.) ("A violation of the 'laundry list' contained in section 17.46(b) of the DTPA is distinct from a claim for unconscionable conduct under section 17.50(a)(3).").

will support recovery.[13] To recover under either theory, however, a plaintiff must establish more than a mere breach of contract. *See Riddick v. Quail Harbor Condo. Ass'n*, 7 S.W.3d 663, 670 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (stating that a simple breach-of-contract claim is neither a DTPA violation nor an unconscionable act).

Pro–Tech argues Pierce's evidence of her DTPA claims is insufficient because: (1) Pierce failed to establish any of the alleged misrepresentations that serve as the basis of her DTPA claims; (2) there is no evidence to support any unconscionable action or course of action by Pro–Tech; (3) Pierce failed to establish any reliance or causation in relation to her DTPA claims; (4) Pierce's claims are essentially contractual claims, precluding liability under the DTPA; and (5) there is no evidence, or factually insufficient evidence, to support any implied finding Pro–Tech's alleged conduct was knowing or intentional under the DTPA.

We discuss Pierce's two DTPA claims separately.

### 1. Unconscionable Action or Course of Action

"Unconscionable action or course of action' means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE ANN. § 17.45(5) (Vernon 2002). A court examines the entire transaction to determine whether a defendant took advantage of a consumer to a grossly unfair degree. *See Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex.1985). A plaintiff need not prove reliance to establish a claim based on unconscionability. *Compare* TEX. BUS. & COM.CODE ANN. § 17.50(a)(1)(B) (requiring a claimant to demonstrate reliance in order to maintain an action for a "laundry list" violation), *with* TEX. BUS. & COM. CODE ANN. § 17.50(a)(3) (omitting reliance requirement). The plaintiff also need not prove specific representations. *See Teague*, 793 S.W.2d at 54 ("A consumer may maintain a DTPA cause of action for unconscionable conduct even if the seller made no specific misrepresentations.").

We interpret Pierce as arguing that the following supports her claim of Pro–Tech's unconscionable conduct:

> Appellants ran Ms. Pierce and her daughter out of their home with the clothes on their back, ripped up the home beyond the point of habitability, deserted the job without providing proof that the toxic mold had been removed, and failed to restore the home or contents—indeed, had no intention of doing so, despite the contract having been signed and full payment in advance for the services having been made.

In stating that "Appellants ran Mrs. Pierce and her daughter out of their home with the clothes on their back," Pierce refers to Pro–Tech's representation that there was toxic mold in the house, and its instruction to Pierce to vacate the premises.[14] Therefore, we must determine whether the following acts, individually or collectively, are unconscionable: (1) Pro–Tech advised Pierce to remove her family from the house immediately, without taking time to pack; (2) Pro–Tech "ripped up the home beyond the point of habitability"; (3) Pro–Tech ceased work on the contract;

---

**13.** *Teague v. Bandy*, 793 S.W.2d 50, 54 (Tex. App.-Austin 1990, writ denied).

**14.** According to Pierce, Mays told her not to pack, but to leave seven changes of clothes by the door, and assured Pierce that the clothing would be remediated and turned over to her.

and (4) Pro–Tech had no intention of performing the contract.

■ First, Pierce presented no evidence that Pro–Tech misrepresented the presence of mold or its risks, and Pierce does not contend it was unnecessary for her family to leave the home. Second, Pro–Tech's actions in "ripping up the home" were performed pursuant to the contract and to Pro–Tech's representations to Pierce and her insurer that it was necessary to remove carpeting, air conditioning, cabinetry, fixtures, sheetrock, etc. Again, Pierce does not contend these measures were unnecessary. Pierce's third contention merely alleges breach of contract.

■ Pierce finally contends Mays never intended to restore the house or remediate its contents. *See Formosa Plastics Corp. USA v. Presidio Engrs. & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998) (stating that the promise of future performance constitutes actionable misrepresentation if the promise was made with no intention of performing at the time the promise was made, and evidence presented must be relevant to the defendant's intent at the time the defendant made the promise).[15] The determination of intent is uniquely an issue for the fact-finder because it depends on the weight and credibility to be assigned to testimony. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986). However, evidence "so weak that it creates only a mere surmise or suspicion of its existence ...

constitutes no evidence." *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992). Here, Pro–Tech contends there is no evidence it did not intend to perform the contract.

In response to this argument, Pierce points only to Mays's trial testimony that (1) Pro–Tech would have done mold and water remediation, restoration of contents and structure if it had been paid to do so, (2) over half of the initial check to Pro–Tech for more than $24,000 was for "content packout," not remediation, and (3) Pro–Tech was never paid to do any remediation of the contents of the house or personal property. We cannot say this testimony constitutes some evidence of Mays's intent not to restore the home or remediate its contents at the time he entered into the contract with Pierce.

We note that Mays testified, "There was never any contract between Pro–Tech and Connie Pierce to rebuild the house," and courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise. *See Spoljaric,* 708 S.W.2d at 435. However, when read in context, it is clear Mays contends Pro–Tech was not paid to remediate the home's contents or to restore the building, and not that Pro–Tech had never agreed to perform the work at all:

Q [by Pierce's counsel]: [The work order] is what Pro–Tech said it was going to do for Mike and Connie Pierce, correct?

**15.** In *D.S.A., Inc. v. Hillsboro Independent School District,* the Texas Supreme Court reasoned, "The *Formosa* opinion's rejection of the independent injury requirement in fraudulent inducement claims does not extend to claims for negligent misrepresentation." 973 S.W.2d 662, 663 (Tex.1998). In *Haase v. Glazner,* the supreme court rejected the plaintiff's argument that "tort damages for fraud can be recovered even where the plaintiff suffers only economic loss related to the contract's subject matter." 62 S.W.3d 795, 798 (Tex.2001). Thus, we conclude the *Formosa* court's rejection of the independent injury rule is limited to fraudulent inducement claims and does not extend to fraud generally. *See Heil Co. v. Polar Corp.,* 191 S.W.3d 805, 816–17 (Tex.App.-Fort Worth 2006, pet. filed) (citing *D.S.A.* and *Haase* and declining to extend *Formosa* analysis to fraud claim).

A [Mays]: Yes.

Q: Mold and water remediation, restoration of contents and structure, correct?

A: That's what we would have done if we had been paid to do that.

\* \* \* \* \*

Mays: We did exactly what we were paid to do. We were paid to do remediation of the home, we remediated the home. We were paid to move the contents out of the home, we did that. We were never paid to rebuild the home, and that's why we never rebuilt the home.

Here, the evidence that Pro–Tech entered into the agreement with no intent of performing is "so weak that it creates only a mere surmise or suspicion of its existence." *See T.O. Stanley Boot Co.,* 847 S.W.2d at 222. "When evidence is so weak[,] it constitutes no evidence." *Id.* Because the evidence is so weak that it creates only a suspicion of Pro–Tech's lack of intent to perform, we conclude the evidence is legally insufficient to support Pierce's claim of an unconscionable action or course of action.

**2. *False, Misleading, or Deceptive Acts or Practices***

Pierce states an additional or alternative DTPA claim pursuant to Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7). These subsections provide that false, misleading, or deceptive acts or practices include:

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

\* \* \* \* \*

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. . . .

Tex. Bus. & Com.Code Ann. § 17.46(b)(5), (7).

■ In her claim under section 17.46(b), Pierce relied on evidence of the following representations: (1) Pro–Tech would, in a timely manner, remove the toxic mold and would restore the contents and structure as set forth in the work order/contract, and (2) Pro–Tech would provide a certificate showing the house had been retested and was safe. The only evidence of such representations is the contract itself and bids prepared by Pro–Tech after entering into the contract. The bids include the costs of post-remediation testing and the costs of storing Pierce's personal property for two to three months.

■ Pro–Tech contends Pierce's 17.46(b) claim constitutes nothing more than a breach-of-contract claim. The determination of whether a breach of contract rises to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry. *Chilton Ins. v. Pate & Pate Enter., Inc.,* 930 S.W.2d 877, 890 (Tex.App.-San Antonio 1996, writ denied). Whether the facts, once ascertained, constitute a DTPA misrepresentation is a question of law. *Id.*

Here, Pierce did not show she was harmed by Pro–Tech's representations, but only showed harm caused by Pro–Tech's failure to perform. *See Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14–15 (Tex. 1996) (per curiam) (holding no DTPA violation when statements of Yellow Pages representative did not cause any harm, but, instead, failure to run advertisement actually caused plaintiff's lost profits). Pierce

contends Pro–Tech never intended to restore the house or remediate its contents, but as discussed previously, we conclude the evidence of Pro–Tech's intent is legally insufficient.

Accordingly, we hold Pro–Tech's failure to perform as represented does not rise above a breach-of-contract claim, and therefore is not actionable under the DTPA. *See id.* Having concluded there is legally insufficient evidence to support Pierce's DTPA claims, we sustain Pro–Tech's issue to the extent Pro–Tech challenges the sufficiency of the evidence to support those claims. Accordingly, we reverse that portion of the judgment awarding additional DTPA damages of $43,678.50 and render judgment that Pierce take nothing on her DTPA claims.

## B. Pierce's Breach–of–Contract Claim

■ The elements of a breach-of-contract action are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex.App.-Houston [14th Dist.] 2000, no pet.). A breach occurs when a party fails or refuses to do something he has promised to do. *See Townewest Homeowners Ass'n v. Warner Comm'n Inc.,* 826 S.W.2d 638, 640 (Tex. App.-Houston [14th Dist.] 1992, no writ).

■ Pro–Tech argues Pierce's evidence of her breach-of-contract claim is insufficient because Pierce failed to (1) offer any competent evidence to establish Pro–Tech failed to perform mold remedia-

tion services, (2) establish any contractual duties regarding potential physical damage to the residence or contents, and (3) establish any contractual duty for Pro–Tech to rebuild or remodel her residence.[16] In her petition, Pierce alleged Pro–Tech breached the contract "when Pro–Tech Restoration failed to complete the services of mold remediation, thus leaving the house uninhabitable and the contents unusable. Pro–Tech Restoration further breached the contract described in this petition when they [sic] caused damage to Connie Pierce's house and the contents of the house." At trial, Pierce asserted Pro–Tech had contracted to rebuild or restore her house and the contents after it completed remediation, but never did so.

### 1. Restoration of the Structure and Remediation of Contents

It is undisputed that Pro–Tech ceased work on Pierce's house on March 3, 2002, but did not return the key until July 2002. At the time Pro–Tech left, it had placed biohazard warning signs on the exterior of the house, removed carpet, cabinets, appliances, sheetrock, and the air conditioner, and virtually emptied the living area of the house of its contents, moving some items into off-site storage and placing others items in the garage. It is also undisputed that Pro–Tech did not rebuild the house or remediate the contents. Additionally, there was testimony indicating Pro–Tech did not provide Pierce with a certificate showing the house had been retested and was clear of toxic mold.[17] Thus, the issue in this case is not what Pro–Tech did or failed to do, but rather the scope of what Pro–Tech promised to do. By the terms

---

**16.** Although Pro–Tech casts its breach-of-contract argument in terms of "no evidence, or alternatively factually insufficient evidence," it develops only "no evidence" arguments.

**17.** According to the results of a test in July 2002, there was still mold in the house as of that date. Mays disputes the reliability and relevance of this test as evidence of whether he had completed remediation when he left in March 2002.

of the contract/work order, Pro–Tech described the "scope of the work to be performed" as "mold & water remediation/restoration of contents & structure." Thus, the contract between Pierce and Pro–Tech unambiguously included remediation of the home's contents and restoration of the structure.

Moreover, Pro–Tech prepared a set of documents under the heading of "Estimates and Tests." These documents included a bid Pro–Tech submitted to Farmers for the dwelling, including a room-by-room estimate of the itemized costs for remediation and a separate room-by-room estimate of the itemized costs of reconstruction. These documents also listed the cost for post-remediation testing. Based on these figures, Farmers calculated a net claim for the dwelling, including mold remediation, post-remediation testing, and rebuilding the house. Pro–Tech also submitted a separate bid for remediation of the contents.

We conclude there is legally sufficient evidence that Pro–Tech breached the terms of the work order/contract when it failed to remediate the contents of Pierce's home and restore the structure. We also conclude there is legally sufficient evidence that Pro–Tech breached a promise to Pierce when it did not provide a certificate showing the house had been retested for mold.

### 2. Mold Remediation

■■ Pro–Tech also argues the evidence is insufficient to support a finding of breach of contract because Pierce presented no evidence Pro–Tech failed to perform mold remediation. With this argument,

Pro–Tech attempts to isolate the promise to perform mold remediation from the remaining promises in the contract and insurance bids. As discussed above, the contract contemplated that Pro–Tech would return Pierce's house and its contents to her in a remediated and restored state. Pro–Tech's argument is therefore contrary to the general principle of contract construction that requires a court to examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999).[18]

### 3. Damage to House and Contents

In response to Pierce's contention that Pro–Tech breached the contract by damaging Pierce's house and its contents, Pro–Tech points to a hold-harmless cause in the work order/contract; however, Pro–Tech did not plead release as an affirmative defense. *See* Tex.R. Civ. P. 94 (stating party shall set forth affirmatively release and any other matter constituting an avoidance or affirmative defense); *Cole v. Johnson,* 157 S.W.3d 856, 862 (Tex.App.-Fort Worth 2005, no pet.) (stating hold-harmless agreement is synonymous with release).[19]

In summary, we hold the evidence is legally sufficient to support the trial court's implied finding that Pro–Tech promised to perform mold remediation, post-remediation testing, *and* to remediate the home's contents and rebuild the structure, but did not do so. Accordingly, we overrule Pro–Tech's issue to the extent it

---

**18.** In addition, Pro–Tech's actions in leaving biohazard signs on the house are also some evidence that the mold was not remediated. Moreover, when Pro–Tech returned Pierce's house key in July 2002, the house still contained mold.

**19.** Pro–Tech does not contend the issue was tried by consent, nor do we find this to be the case.

challenges the sufficiency of the evidence on Pierce's breach-of-contract claim.

## C. Pierce's Conversion Claim

Appellants challenge the legal and factual sufficiency of the evidence to support Pierce's claim for conversion. Pierce does not respond to this argument on appeal.

▆▆▆ Conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the owner's rights. *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 391 (Tex.1997). Here, Pierce alleges Pro–Tech converted one of her credit cards, pointing to unauthorized purchases on the account; however, Pierce presented no evidence that the amounts were charged by Edward or Traci Mays or by anyone under Pro–Tech's control. Accordingly we sustain Pro–Tech's issue to the extent it challenges the sufficiency of the evidence on Pierce's conversion claim.

## D. The Challenges to Damages

Pro–Tech presents the following five arguments regarding the trial court's award of damages: (1) the evidence is legally, or alternatively factually, insufficient to support any award based on mental anguish; (2) Pierce failed to offer competent evidence to establish any recoverable measure of damage available under the DTPA or her breach-of-contract claims; (3) Pierce failed to offer competent evidence to permit the recovery of out-of-pocket expenses; (4) Pierce failed to offer competent evidence to recover the value of her personal property; and (5) Pierce is not entitled to the recovery of attorneys' fees or additional DTPA damages.

The trial court rendered judgment in Pierce's favor and awarded actual damages of $43,678.50 without specifying the claim or claims on which Pierce prevailed or the proven damages. Having concluded that Pierce presented sufficient evidence to support liability only on her breach-of-contract claim, we address the sufficiency of Pierce's evidence to support damages for that claim.

▆▆▆ The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *Walden v. Affiliated Computer Servs., Inc.,* 97 S.W.3d 303, 328 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed. *SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.,* 128 S.W.3d 304, 317 n. 6 (Tex.App.-Dallas 2004, no pet.). Nevertheless, as the Seventh Court of Appeals explained in the context of discussing whether damages for misrepresentation and breach of contract constitute double recovery:

> The theories of recovery for misrepresentation include out-of-pocket expenses or loss of the benefit of the bargain. The recovery of out-of-pocket expenses compensates one for actual loss due to another's representation while a benefit-of-the-bargain recovery allows the recovery of what an individual might reasonably have expected to recover as the result of another's representation. In contract law, theories of recovery for a breach of contract include reliance or expectancy damages. Reliance damages, similar to out-of-pocket recovery, reimburse one for expenditures made towards the execution of the contract in order to restore the status quo before the contract. Expectancy damages, similar to benefit-of-the-bargain recover-

ies, award damages for the reasonably expected value of the contract. Thus, the theories of recovery for both tortious misrepresentation and breach of contract are similar and necessarily involve the same type of damages. . . .

*Hart v. Moore,* 952 S.W.2d 90, 97 (Tex. App.-Amarillo 1997, pet. denied).

In the present case, Pierce's total request for actual damages, whether arising from Pro–Tech's breach of contract or from its actions allegedly violating the DTPA, consists of the following:

| | |
|---|---|
| $29,121.50 | total amount Farmers Insurance paid to Pro-Tech |
| 8,226.00 | damage to property stored in garage |
| 822.00 | additional storage fees |
| 875.00 | "post-remediation" inspection report |
| 360.00 | moving expenses |
| 15,000.00 | additional living expenses (6 months @ $2,500/month) |
| $54,404.50 | total actual breach of contract/DTPA damages requested |

The trial court's award of $43,678.50 was therefore $10,726.00 less than Pierce's requested DTPA/breach-of-contract damages.

■ A trial court has discretion to award damages within the range of the evidence presented at trial. *City of Houston v. Harris County Outdoor Adver. Ass'n,* 879 S.W.2d 322, 334 (Tex.App.-Houston [14th Dist.] 1994, writ denied). With this precept in mind, we turn to Pro–Tech's specific arguments challenging the sufficiency of the evidence to support the award of actual damages.

### 1. Mental Anguish Damages

Pro–Tech first challenges the sufficiency of the evidence to support an award of mental anguish damages. Although Pierce pleaded for mental anguish damages, at trial she did not refer to or request any

amount for mental anguish damages. Thus, Pro–Tech's challenge to the sufficiency of the evidence to support mental anguish damages is without merit.

### 2. Recovery of Amounts Farmers Paid to Pro–Tech

■ Pro–Tech's second argument appears directed at damages compensating Pierce for the sums she, through her insurer, paid to Pro–Tech. Pro–Tech argues, regardless of whether one applies a benefit-of-the-bargain measure of damages or an out-of-pocket measure of damages, Pierce failed to prove the value of the services she actually received. *See Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984) (defining benefit-of-the-bargain and out-of-pocket damages in context of DTPA case). We disagree.

■ The trial court could have found that Pro–Tech's services were of zero value. Pierce presented the following evidence supporting that interpretation: (1) testimony and photographs showing that Pro–Tech left Pierce's house virtually empty of its contents, essentially gutted except for the wiring and some sheetrock; (2) testimony that Pro–Tech had removed and not replaced the air conditioner; (3) testimony that Pro–Tech had not provided Pierce with a certificate showing the house had been cleared of mold, and when Pierce tried to find someone else to rebuild, there were still biohazard signs on the house; (4) testimony that Mays did not return Pierce's key until July 2002; and (5) documentation of the results of an inspection done in July 2002, showing the house contained toxic mold as of that date.[20]

---

**20.** Because the trial court awarded Pierce $10,726.00 less than she requested for her breach-of-contract/DTPA damages, the trial court could have found that this amount represented (a) the damages Pierce failed to prove, (b) the value of Pro–Tech's services, or (c) some combination of the two. For example, it is undisputed that Pro–Tech was paid $29,121.50 for services it provided to Pierce. According to Mays, these services consisted of

Pro–Tech, however, contends Pierce's evidence is legally insufficient because (1) Pierce did not provide competent evidence that Pro–Tech had not performed remediation and Pierce failed to plead or prove Pro–Tech had contracted to rebuild; (2) Pierce offered no evidence to establish the reasonable value of the services Pro–Tech performed; and (3) to the extent Pierce relied on completion costs, the amounts charged by or paid to Pro–Tech constitutes no evidence of the reasonableness of those costs. Again, we disagree. Regarding Pro–Tech's first and second points, we have construed the contract as requiring Pro–Tech to provide both remediation and restoration. Because Pro–Tech left Pierce's house in the condition that it did, the trial court could have reasonably found that any work Pro–Tech may have performed was of zero value. Regarding Pro–Tech's third point, there is nothing in Pierce's argument to the trial court to suggest she characterized reimbursement for the sums Farmers had paid Pro–Tech as completion costs.

### 3. Out–of–Pocket Expenses

Pro–Tech next complains about Pierce's evidence of her out-of-pocket expenses for moving her stored items to a second facility, additional storage fees, an inspection report, and additional living expenses. Pierce presented her own testimony regarding her expenses for the first two items, her testimony and a receipt for the third item, and testimony and insurance documents showing what Farmers had paid for Pierce's living expenses during the period covered by her claim.

Pro–Tech challenges the legal sufficiency of this evidence solely on the ground that Pierce purportedly did not establish that her expenses were reasonable and necessary. In support of this argument, Pro–Tech cites *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 200–01 (Tex.2004), which, in turn cites *Dallas Ry. Terminal Co. v. Gossett*, 156 Tex. 252, 294 S.W.2d 377, 382–83 (1956).[21]

(a) packing and storing some of the contents of Pierce's home, (b) remediating mold in the home's structure, and (c) performing a post-remediation clearance test. Additional evidence supported Mays's testimony that Pro–Tech packed and moved some of the contents of Pierce's home; however, Pro–Tech offered only Mays's testimony to show that any remediation was performed or that post-remediation testing was conducted. As the finder of fact, the trial court was free to disbelieve this testimony and to conclude that Pro–Tech was not entitled to be paid for services that were not performed. Although Mays testified that the cost of packing and moving the contents of Pierce's home was more than $12,000.00, Pierce testified that Pro–Tech caused damage or destruction to her property totaling $8,226.00. Thus, the trial court could have concluded that the value of Pro–Tech's services was less than $4,000.00 and reduced the amount of Pierce's recovery accordingly. The trial court might also have disbelieved Pierce's testimony concerning damaged property but believed Pierce's testimony indicating that the value of packing and moving the contents of Pierce's home was only $360.00—*i.e.*, the amount of moving expenses Pierce testified she incurred in moving the contents a second time. However, we need not recreate the fact-finder's calculations in order to determine whether the amount of actual damages awarded was within the range of evidence presented at trial. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 457 (Tex.1992) (noting that a jury's award of damages within the range of evidence will stand if damages were submitted in a broad-form question in which damages are not itemized).

21. Pro–Tech also cites *Coker v. Burghardt*, 833 S.W.2d 306 (Tex.App.-Dallas 1992, writ denied). The issue in *Coker* was whether the trial court abused its discretion in admitting an owner's testimony about the cost of repairing his car. *See id.* at 310–11. The appellate court did not consider Burghardt's contention that the DTPA did not require he show the car repair costs were reasonable. *See id.* at 311 n. 4.

In *Mustang Pipeline*, the Texas Supreme Court observed that Mustang's expert "was careful to limit his opinion solely to what it cost [a second company] to complete the contract, and not whether that contracted amount was a reasonable cost to build a pipeline." *Mustang Pipeline*, 134 S.W.3d at 201. The court also pointed to evidence indicating that the amount may not have been reasonable under the circumstances. *See id.* In *Gossett*, the Texas Supreme Court observed that "the amount of the charges [was] the only evidence in the record which might throw any light on the reasonable value of the services rendered." *Gossett*, 294 S.W.2d at 382.

■ Here, Pierce's evidence included not only testimony and documentation of her out-of-pocket expenses for storage, inspection, and additional living expenses, but also evidence of what Farmers had been willing to pay for similar categories of expenses. Additionally, Mays testified that the cost for packing and moving the contents of Pierce's home exceeded $12,000.00. Thus, there is some evidence of the reasonableness of Pierce's out-of-pocket expenses (*i.e.*, $822.00 total for additional storage, $360.00 for moving expenses, $875.00 for the July 2002 inspection, and $2,500.00 per month for additional living expenses).[22]

#### 4. Damage to Personal Property

Pro–Tech also challenges the legal sufficiency of Pierce's evidence that she incurred $8,226.00 in damages to her stored personal property. Specifically, Pro–Tech contends (1) although Pierce testified about the "fair value" of the property, she did not testify about the fair *market* value; (2) she did not tie her estimate of value to the location where the damages occurred; and (3) she did not distinguish between the damaged property and the destroyed property.

Because we have determined that the categories of actual damages previously discussed are supported by sufficient evidence, and because these categories of damages exceed the trial court's award, we do not reach this argument.

We overrule Pro–Tech's issue to the extent it challenges the sufficiency of the evidence of actual damages.

#### 5. DTPA Additional Damages and Attorneys' Fees

■ Finally, Pro–Tech argues Pierce is not entitled additional DTPA damages or the recovery of attorneys' fees. As discussed above, we reverse the part of the judgment awarding Pierce DTPA damages; however, we have concluded there is sufficient evidence to support Pierce's breach-of-contract claim and the award of actual damages for that claim. Here, Pierce may recover reasonable attorneys' fees for that claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997) (stating person may recover reasonable attorneys' fees in addition to the amount of valid claim if claim is for an oral or written contract). Pro–Tech does not challenge

---

**22.** Pro–Tech refers to Mays's testimony that Pierce "was partially moved from the house in 12–'01 when we signed the contract," but does not directly challenge the evidence regarding the number of months for which Pierce claims additional living expense damages. Instead, Pro–Tech's challenge appears to be directed at the monthly charges Pierce alleged:

None of the expenses sought by Appellee were established as being reasonable and necessary by expert testimony, or by affidavits from the respective custodians of records under Tex. Civ. Prac. & Rem.Code § 18.0001 et sec. Additionally, appellee failed to establish that she had personal knowledge of, or familiarized herself with, the reasonable charges for the expenses in the county where the same were incurred.

the reasonableness of Pierce's attorneys' fees, but only Pierce's entitlement to them. We overrule Pro–Tech's issue to the extent it challenges the award of attorneys' fees.

### Conclusion

Having concluded Pierce's allegations do not rise above a breach-of-contract claim, we reverse the part of the judgment awarding Pierce additional DTPA damages and render judgment that Pierce take nothing on her DTPA claim. Having concluded Pierce presented sufficient evidence to establish her breach-of-contract claim and actual damages, we affirm the remainder of the judgment awarding actual damages, attorneys' fees, and pre- and post-judgment interest.