

## NUMBER 13-11-00502-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

## IN THE INTEREST OF J.J.R., A CHILD

---

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION[1]

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

This is a suit affecting a parent-child relationship. Following the death of J.J.R.'s mother, appellant Lionzo Ramirez, J.J.R.'s biological father, filed a petition to modify the parent-child relationship. Appellee Maria Concepcion Mendoza, J.J.R.'s maternal grandmother, intervened seeking joint managing conservatorship of the child. Following a bench trial, the district court entered its order awarding Mendoza joint managing

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

conservatorship of J.J.R. with the right to designate J.J.R.'s primary residence. It awarded Ramirez joint managing conservatorship with the right of possession. By two issues, Ramirez contends that: (1) the trial court abused its discretion when it granted the relief requested in Mendoza's plea in intervention; and (2) the trial court abused its discretion in awarding Mendoza access to the child because she did not establish the "significant impairment" element of section 153.433 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 153.433 (West Supp. 2011) (setting out the requisite standard for a grandparent to obtain court-ordered access to a grandchild). We affirm.

## I. Background

It is undisputed that in August 2004, through a negotiation conference, J.J.R.'s mother and Ramirez were appointed joint managing conservators of J.J.R.—the mother to have the exclusive right to designate J.J.R.'s primary residence and the father to have the right to possession. *See id.* § 233.001-.029 (West 2008 & Supp. 2011) (setting out the child support review process to establish or enforce support obligations). On August 22, 2009, J.J.R.'s mother died. Ramirez alleges that he attempted, but failed, to gain possession of the child from Mendoza, J.J.R.'s maternal grandmother, with whom J.J.R. had been living, and the child remained with Mendoza without a court order.[2]

On November 23, 2009, Ramirez filed his petition for modification asking to be appointed "the sole managing conservator of the child," and "as the person who has the right to designate the primary residency of the child." Mendoza, who apparently had not participated in the original negotiation that established custody of the child, intervened in the proceeding on May 11, 2010. She requested to be appointed joint managing

---

[2] Mendoza testified that J.J.R. has lived with her since he was born.

2

conservator with the right to designate the child's residency. At the final hearing, Ramirez challenged Mendoza's plea in intervention on the basis that it did not meet the requirements of section 153 of the family code because Mendoza attached no affidavit declaring that "denial of possession of or access to [J.J.R.] by [Mendoza] would significantly impair [J.J.R.'s] physical health or emotional well-being." *Id.* § 153.432(c) (West Supp. 2011). Ramirez informed the trial court that an affidavit did not exist. The trial court did not rule on this objection and took a brief recess to allow it to review law submitted by the parties.

Ramirez now acknowledges that following this recess, Mendoza's counsel provided the trial court with an unverified document entitled "INTERVENOR'S SUPPORTING AFFIDAVIT." A copy of that document appears in the appellate record.

After the document was presented to the trial court, Ramirez's counsel argued the following:

> Also applicable in this lawsuit is Section 153.432 . . . . [S]ubsection (c) . . . states: In a suit [by a biological grandparent requesting possession of or access to a grandchild] . . . , a person filing the suit must execute and attach an affidavit on knowledge or belief that contains along with supporting facts the allegation that denial of possession of or access to the child by Petitioner would significantly impair the child's physical health or emotional well-being.
>
> In this case, there is no such affidavit. There is a petition for intervention, which does not meet the requirements under 153. That in and of its face would require this Court to dismiss that Petition to [sic] Intervention. There's no other means for her to gain access to that child.

The trial court did not rule on this objection and, after hearing arguments of counsel, concluded Mendoza had standing to bring her claim.

The trial court then heard testimony and argument involving the conservatorship of J.J.R. and concluded that Ramirez and Mendoza would be joint managing conservators

3

of J.J.R. It awarded designation-of-residency to Mendoza and standard visitation rights to Ramirez. This appeal followed.

## II. Intervention

By his first issue, Ramirez challenges Mendoza's intervention. Ramirez contends that Mendoza's petition did not meet the requirements of section 153 of the family code, first, because no affidavit was attached, and second, because the purported affidavit that was presented to the trial court was not verified. *See id.* In support of this contention, Ramirez repeats the above arguments made by his trial counsel. However, even assuming that Ramirez properly objected, we conclude that he did not preserve this issue for our review because the trial court did not rule on his objection. *See* TEX. R. APP. P. 33.1(a)(1)(A). We overrule Ramirez's first issue.

## III. Conservatorship of the Child

Ramirez asserts, by his second issue, that the trial court abused its discretion in its application of section 153.433 of the family code when it awarded conservatorship of J.J.R. to Mendoza.[3] *See* TEX. FAM. CODE ANN. § 153.433. Ramirez contends that Mendoza did not establish by a preponderance of the evidence that a denial of her access to J.J.R. would "significantly impair" the child's physical health or emotional well-being. *See id.* § 153.433(a)(2). Ramirez argues that apart from Mendoza's belief that J.J.R.'s health or emotional well-being would be harmed if removed from her possession and if denied access to him, there is no evidence to establish a "significant impairment" exists.

---

[3] Ramirez generally contends by his second issue that the trial court also erred in its application of sections 153.432 and 153.434 of the family code. *See* TEX. FAM. CODE ANN. §§ 153.432, 153.434 (West 2008 & Supp. 2011) (providing for or limiting a grandparent's request for possession of or access to a grandchild). Ramirez does not, however, develop contentions or arguments specific to sections 153.432 and 153.434 in his second issue. Therefore, our analysis of this issue will not include these sections. *See* TEX. R. APP. P. 38.1(i).

4

We disagree.

## A. Standard of Review

We review a trial court's decision to grant a grandparent's request for access or possession for an abuse of discretion. *In re Chambless*, 257 S.W.3d 698, 699 (Tex. 2008) (orig. proceeding) (per curiam); *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (orig. proceeding) (per curiam). In this case, "[a] trial court abuses its discretion if it grants [possession of a grandchild] when the grandparent has not proven that denying the grandparent access to the child would significantly impair the child's physical health or emotional well-being." *In re B.G.D.*, 351 S.W.3d 131, 141 (Tex. App.—Fort Worth 2011, no pet.) (citing *In re Scheller*, 325 S.W.3d 640, 643 (Tex. 2010) (orig. proceeding) (per curiam) (quoting *Derzapf*, 219 S.W.3d at 333)).

In family law cases, the abuse of discretion standard of review overlaps with traditional sufficiency standards of review. *In re B.M.*, 228 S.W.3d 462, 464 (Tex. App.—Dallas 2007, no pet.); *In re Marriage of Hale*, 975 S.W.2d 694, 697 (Tex. App.—Texarkana 1998, no pet.); *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet). As a result, legal and factual insufficiency are not independent grounds of reversible error, but instead are factors relevant to our assessment of whether the trial court abused its discretion. *In re B.M.*, 228 S.W.3d at 464; *Doyle*, 955 S.W.2d at 479; *Scoggins*, 200 S.W.3d at 836. To determine whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and whether it erred in its exercise of that discretion. *In re B.M.*, 228 S.W.3d at 464.

In a nonjury trial, when no findings of fact or conclusions of law are filed or properly

5

requested, we infer that the trial court made all the necessary findings to support its judgment. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam); *Waltenburg v. Waltenburg*, 270 S.W.3d 308, 312 (Tex. App.—Dallas 2008, no pet.); *Mays v. Pierce*, 203 S.W.3d 564, 571 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). When the inferred findings of fact are supported by the evidence, the appellate court must uphold the judgment on any theory of law applicable to the case. *Giangrosso v. Crosley*, 840 S.W.2d 765, 769 (Tex. App.—Houston [1st Dist.] 1992, no writ). In addition, we defer to the trial court to resolve conflicts in the evidence and to determine the weight to be given the testimony. *Bates v. Tesar*, 81 S.W.3d 411, 425 (Tex. App.—El Paso 2002, no pet.); *see also Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 270-71 (Tex. App.—Fort Worth 2004, no pet.) (providing that as the finder of fact for the proceeding, the trial court is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony). The trial court is in the best position to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record. *Bates*, 81 S.W.3d at 424.

**B.  Applicable Law**

To obtain possession of or access to a grandchild, the petitioner must overcome the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that, among other things, the child's physical health or emotional well-being would be significantly impaired if the grandparent's access or possession was denied. Tex. Fam. Code Ann. § 153.433(a)(2); *Derzapf*, 219 S.W.3d at 333-35 (citing Tex. Fam. Code Ann. § 153.433(2) (current version at Tex. Fam. Code Ann.

6

§ 153.433(a)(2))); *see Troxel v. Granville*, 530 U.S. 57, 72-73 (U.S. 2000).[4] The proper standard of proof then is a preponderance of the evidence, *see* TEX. FAM. CODE ANN. § 153.433(a)(2), meaning "the greater weight of the credible evidence." *Murff v. Pass*, 249 S.W.3d 407, 409 n.1 (Tex. 2008) (per curiam) (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam)).

## C.  Evidence

To meet her burden to prove that denying her access to or possession of J.J.R. would significantly impair the child's physical health or emotional development, Mendoza testified to the following:

- Mendoza helped raise J.J.R. since he was born.  She thinks of him as a son because she has "trained him since he was a baby" and has taken "him to the doctor and everything else."

- Mendoza is raising her daughter's three sons:  J.J.R., who was soon to be seven, J.J.R.'s half-brother, age nine, and another half-brother, age five. J.J.R. is attached to his two brothers and is very attached to her.

- About a year after J.J.R.'s birth, DNA testing established that Ramirez was J.J.R.'s father.  However, over the course of the last five years Ramirez "has had very little relationship with J.J.R."  Since J.J.R.'s mother passed away two years earlier, Ramirez has seen J.J.R. about two times.

- J.J.R. is hyperactive.  He is an aggressive child; he kicks when he is not given what he wants or becomes violent with others.  However, J.J.R. has never tried to hurt Mendoza or his brothers.

- J.J.R. sees six doctors and takes medication.  When he is not medicated, Mendoza knows how to talk with him because she has "had him a long time."  If J.J.R. misses his medical appointments, he gets aggressive and wants to hurt the whole world.

---

[4] In *Troxel v. Granville*, the United States Supreme Court held that a parent has a fundamental right to decide who has access to a child, assuming the parent is "fit."  *See* 530 U.S. 57, 66 (2000).  The *Troxel* Court described a fit parent as one who "adequately cares" for his or her children.  *Id.* at 68.  In this case, we need not address the application of *Troxel* in this regard because the trial court appointed Ramirez joint conservator implying that he is "fit."  Mendoza intervened seeking joint, not sole, conservatorship, and she does not challenge this implied finding by way of a cross-appeal.

- In 2007, Child Protective Services (CPS) gave Mendoza custody of all three boys. This was after Ramirez had been designated J.J.R.'s father and before J.J.R.'s mother died.

- Mendoza believed removing J.J.R. from her home would "affect him because he's going to become very hysterical," "he's going to become aggressive."

- J.J.R. told Mendoza that he did not want to go with Ramirez. He also told her that if she sent him with Ramirez, it was because she did not love him.

- The last time J.J.R. was with Ramirez, J.J.R. told Mendoza that he wanted to come back.

- Mendoza believes that taking J.J.R. from her would affect the progress he has made with his psychiatrist and his psychologist.

- On cross-examination, Mendoza testified that J.J.R. told her that "if his dad takes him he will escape and come back to [her]." She bases her opinion on the fact that "when [J.J.R.] gets mad, he's aggressive." Mendoza agreed that other than what she and her grandson had discussed, she had no other evidence to support her opinion that the denial of J.J.R.'s access to her would cause significant impairment of his physical health or emotional well-being.

- The trial court questioned Mendoza regarding J.J.R.'s comments about his visits with Ramirez. Mendoza informed the court that approximately two months before the hearing, J.J.R. told her that he would escape if he was sent to his father; however, J.J.R. had never been sent to his father and actually tried to come back to her on his own. Mendoza also explained to the court that about three years ago while J.J.R.'s mother was still alive, Mendoza had J.J.R. admitted to a hospital for mentally ill children because he would go to therapy and start kicking and saying that "he was going to kill us with a knife." Ramirez did not visit J.J.R. while he was at the hospital.

Ramirez, his sister, San Juana Martinez, and another sister, Maria Guadalupe Martinez, testified, in relevant part, as follows:

- J.J.R. and Ramirez had a good, happy relationship when they would visit. J.J.R. was not aggressive. Challenging Mendoza's comment that J.J.R. needed to take medication to be controlled, Maria testified that J.J.R. did not take any medication at their house because Mendoza did not send his medication or his insurance card, and he was fine.

8

- In his petition, Ramirez sought sole managing conservatorship of J.J.R. At the hearing, Ramirez agreed that he was asking the court to award him conservatorship of his son and to deny access to Mendoza because he "didn't want any problems."

- They have had conflicts and confrontations with Mendoza regarding visits. According to Ramirez, Mendoza prevented him from seeing his son. Often one or both would call the police. Ramirez explained that the police would tell him that there was nothing they could do, even though Ramirez had a court order.

- Ramirez lives with his mother and a sister in a one-bedroom apartment and sleeps on a mattress in the living room. When the trial court expressed a concern about the sleeping arrangements, one of Ramirez's sisters responded that everyone would be willing to help Ramirez get a bigger place. Ramirez testified that he would look for a house or another apartment.

- Ramirez's family is supportive of his efforts in this matter and will assist him whenever possible.

- All believed that Mendoza is a negative influence on J.J.R. and that J.J.R.'s removal from her would not affect him emotionally because he would be with his father.

- Ramirez believed that Mendoza negatively influenced J.J.R. by manipulating him into doing bad things when J.J.R. was with him, like throwing money and spitting on food. In his opinion, Mendoza told J.J.R. lies and "mess[ed] with a child's mind." For example, Mendoza told J.J.R. that he could not stay with Ramirez because there were things at the apartment that would cause him "allergies" and that he could not sleep on Ramirez's bed because it was too dirty. J.J.R. also told Ramirez that Mendoza does not take him to church and that he did not want to go to church with his father.

- On cross-examination, Ramirez testified that when DNA testing determined that he was J.J.R.'s father, he became responsible and made support payments of $143.00 per month. When the truthfulness of this statement was challenged, Ramirez testified that he stopped making those payments when he was not allowed to see or even communicate with J.J.R. At the time of the hearing, Ramirez owed $2,895.00 in back child support. The child support orders confirming the arrearage were in the court's file, and the trial court agreed to take judicial notice of its file.

- Ramirez informed the court that he does not work, receives monthly income in the amount of $674.00, and does not have a car. Martinez, Ramirez's sister, works as her brother's provider. She "take[s] care of him, "come[s] and see[s] him," and is "with [her] brother all day." Because of the rules and regulations of being a provider, she could not drive Ramirez anywhere, although Ramirez's brothers could take J.J.R. to the doctor, if needed.

- On cross-examination, Ramirez also testified that he did not know J.J.R.'s doctors because he never gets to see his son.

- Ramirez talked with psychologist, Martha Alaniz, Ph.D., who conducted J.J.R.'s social study.[5] Ramirez was not aware that it was Dr. Alaniz's opinion that J.J.R. should be with Mendoza. The trial court took notice of the social study that was in the court's file.

Finally, during argument, the trial court indicated that it "was interested in knowing what police department was being called, allegedly." Counsel explained that it was the sheriff's office because Mendoza lived in the county. Mendoza's counsel's position was that no calls had been made because nothing happened, otherwise there would have been reports. Ramirez's counsel responded that the sheriff's office never gets involved with matters such as these, suggesting that, for that reason, there would be no reports.

## D. Analysis

From the evidence set out above, the trial court could have reasonably concluded that J.J.R.'s physical health or emotional well-being would be significantly impaired if Mendoza's access or possession was denied. J.J.R. had resided with Mendoza since his birth. In making its decision regarding conservatorship, the trial court considered credible evidence presented by Mendoza regarding the very close bond and relationship between Mendoza and J.J.R. even before her daughter's death. It was within the trial

---

[5] Martha Alaniz, Ph.D., was appointed to conduct and prepare a Home Screening (Social Study), to assist the trial court in determining the ability of the parties seeking managing conservatorship of J.J.R. *See* TEX. FAM. CODE ANN. §§ 107.001-.056 (West 2008 & Supp. 2011) (governing "Special Appointments and Social Studies"). Dr. Alaniz assessed the circumstances and condition of J.J.R., specifically those circumstances and conditions involving Mendoza and Ramirez.

10

court's discretion to infer that a break in this close familial relationship could seriously affect J.J.R.'s emotional well-being. The trial court could have decided that the deprivation of love and care from the maternal grandmother whose relationship was more of a mother than a grandmother, as well as the deprivation of the daily interaction with his half-brothers who also lived with Mendoza, would significantly impair the child's emotional well-being. In so deciding, the trial court apparently did not believe Ramirez's testimony that Mendoza had a negative influence on J.J.R. *See Bates*, 81 S.W.3d 424-25; *see also Shear Cuts*, 141 S.W.3d at 270-71; *Roberson*, 768 S.W.2d at 281 (implying that the trial court made all necessary findings to support its judgment when no findings or conclusions are filed).

In addition, while there is conflicting testimony regarding Mendoza's alleged resistance to Ramirez's visits, there is ample evidence to support the judgment. Based on Mendoza's testimony, the trial court could have reasonably determined that Ramirez has not had substantial past contacts with J.J.R., having visited only occasionally over the past few years. *See Bates*, 81 S.W.2d 425. Apparently, the trial court did not believe the level of resistance or alienation testified to by the Ramirez family such that it would necessitate J.J.R's removal from Mendoza's care. The trial court could have believed Mendoza's assertions that Ramirez did not attempt to see J.J.R. on a regular basis and that no reports were filed because the police were not called. *See id.* at 424-25. And it could have disbelieved Ramirez's claim that the police were called and did not want to get involved. *See id.*

Furthermore, based on Mendoza's testimony that she had taken J.J.R. to his doctor's appointments, knew how he reacted when he missed his appointments, and

knew how to take care of him when he was aggressive, the trial court could have reasonably concluded that J.J.R.'s physical health would be significantly impaired if Mendoza's access or possession was denied. The court's determination is further supported by the Ramirez family's acknowledgement that J.J.R. did not get his medications when he was with them on at least one occasion and Ramirez's testimony that he did not know J.J.R.'s physicians and, by inference, was not familiar with J.J.R.'s medical treatment. *See id.*

In addition, it is undisputed that Dr. Alaniz, who interviewed both Mendoza and Ramirez as part of the social study, recommended that J.J.R. remain with Mendoza. This, combined with evidence of CPS's placement of J.J.R. with Mendoza years earlier, supports the trial court's conclusion that J.J.R.'s physical health or emotional well-being would be significantly impaired if Mendoza's access or possession was denied.

Finally, through Ramirez pleadings that requested sole conservatorship and through his testimony that he was asking the court to award him conservatorship of his son and to deny access to Mendoza, the trial court could have reasonably concluded that Ramirez would have completely denied Mendoza access to J.R.R., had he been appointed sole managing conservator. *Cf. In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (orig. proceeding) (per curiam) (interpreting "*Troxel*[, the premier case governing grandparent access,] to mean that when there is no evidence that (1) the child's parent is unfit; (2) the child's health or emotional well-being would suffer if the court defers to her decisions; and (3) the parent intended to exclude the grandparent's access completely, a trial court abuses its discretion by granting grandparent access against the parent's wishes"); *In re D.K.B.*, No. 13-08-00177-CV, 2009 Tex. App. LEXIS 6336, *14-15

12

(Tex. App.—Corpus Christi Aug. 13, 2009, no pet.) (mem. op.) (agreeing that the grandparent presented no evidence specifically rebutting the mandated presumption that the parent would act in the child's best interests in determining when and how the child would interact with her paternal grandmother). This conclusion is supported by the testimony that Ramirez and his sisters believed Mendoza was a "negative influence" on J.J.R. and that they clashed over exchanges. The trial court could have determined that this indicated that Ramirez would not allow Mendoza to visit with J.J.R. if he were granted sole custody.

It is also important to note that the trial court did not give Mendoza sole conservatorship; it allowed Ramirez to see J.J.R. as set out in the standard possession order. The trial court also informed the parties that it expected cooperation in the details of the exchanges and the care of J.J.R. For example, the trial court made observations about the joint conservatorship, including his concerns about where the child would be exchanged, specifically interlineating a safeguard into the order that provided for the exchanges to occur inside a police station where the exchange would be recorded. The trial court also acknowledged and addressed Mendoza's resistance, if any, to Ramirez's visitation by including details of the scheduled visitation in its order. In addition, it communicated its concerns about how J.J.R.'s medical care was to be managed. The details of that discussion were also to be included in the trial court's order.

It is clear from the trial court's comments that it had concluded that Mendoza had established by a preponderance of the evidence that J.J.R. would be harmed if removed from her care and that its focus was on how to facilitate the joint conservatorship. Accordingly, we cannot say that the trial court abused its discretion in finding that

13

Mendoza showed by a preponderance of the evidence—the greater weight of the credible evidence—that denial of her possession of or access to J.J.R. would significantly impair the child's physical health or his emotional well-being. *See Derzapf*, 219 S.W.3d at 333; *see also Murff*, 249 S.W.3d at 409 n.1. In other words, the evidence is sufficient to overcome the parental presumption and to support the trial court's decision to name Mendoza and Ramirez as joint managing conservators, rather than Ramirez as the sole managing conservator. *See* TEX. FAM. CODE ANN. § 153.433(a)(2). We overrule Ramirez's second issue.

## IV. Conclusion

We affirm.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
17th day of May, 2012.