**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00529-CV**

_____

**FAIRMECH INDUSTRIES, Appellant**

**V.**

**TISDALE COMPANY, INC., Appellee**

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 98-09-03267-CV

**MEMORANDUM OPINION**

This appeal arises out of a suit for breach of contract. Fairmech Industries sued Tisdale Company, Inc. for breach of contract. The jury found Tisdale failed to comply with the agreement in which the parties entered, but Tisdale's failure was excused. The trial court entered a take nothing judgment. In two issues, Fairmech, appellant herein, contends the evidence is legally and factually insufficient to support the jury's finding that Tisdale's performance was excused. We affirm the trial court's judgment.

1

## I. Background

Tisdale assembles heating, ventilation, and air conditioning systems ("HVAC") for offshore oil and gas platforms. Jerry Hill, a Tisdale employee, supervised the assembly of pre-commissioned[1] units and commissioned[2] the systems on the various offshore platforms. Tisdale contracted to build and install HVAC units on various platforms for Daewoo and Hyundai, two Korean offshore ship builders. Tisdale contracted to do two projects for Hyundai (NPQ and NPC) and two projects for Daewoo (SHW and SHG). The HVAC systems were pre-commissioned onshore in Korea then sent offshore to the various platforms for the commissioning work. Pre-commissioning work did not require the use of skilled laborers, whereas, commissioning work did.

Fairmech sent Tisdale a proposal to provide laborers to commission Tisdale's HVAC systems at the Daewoo and Hyundai platforms. Tisdale accepted

---

[1] Pre-commissioning involves inspecting the equipment, the control panels, the water lines, and the welds of the HVAC system to determine whether the system arrived safely. Daewoo and Hyundai employees installed the piping and pulled the wires through the control panel. Pre-commissioning also required inspecting this work to ensure it was done properly.

[2] Commissioning requires inspection of the piping, the control panel, the wiring, the HVAC system, and the waterlines. The person commissioning the equipment is required to integrate the HVAC control panel and the chilling equipment so that one system responds to the other. According to the testimony at trial, it takes on average thirty days to properly commission an HVAC system.

the terms of Fairmech's proposal (hereinafter referred to as the "Agreement"). Under the General Provisions of the Agreement that Fairmech drafted, Fairmech agreed to provide Tisdale with "competent and skilled technical personnel, qualified to undertake commissioning work." Fairmech agreed that the commissioning team it sent would "carry all necessary tools and other equipment to accomplish commissioning." The Agreement indicated that Fairmech's commissioning team would work under the direction of Hill or any other supervisors Tisdale assigned. In paragraph twelve of the General Provisions, Fairmech agreed that at the end of each day, Fairmech-designated personnel would present a logbook for verification of time. The Agreement provides that "Tisdale's supervisor or any other personnel assigned by Tisdale shall promptly verify the time and append his signatures." The payment provision of the Agreement states, "Payment shall be made within 10 days of presentation by invoices supported by log-sheets." The Agreement also established a rate of pay for two levels of laborers: "Engineer (Qualified Degree Holder)" and "Skilled and Certified Technical personnel: Mechanical/Electrical/Instrumentation[.]"

At issue in this case are three invoices Fairmech submitted to Tisdale. The first invoice charged $13,333 for work performed at the Hyundai project, the second invoice charged $28,180 for work performed at the Daewoo project, and

the third invoice charged $13,676 for pre-commissioning work at an unspecified project. Tisdale did not pay the invoices. Eventually, Fairmech sued Tisdale for breach of the Agreement seeking to recover the amounts owed and for attorney's fees.

Trial was to a jury. In response to Question 1, the breach of contract question, the jury found Tisdale failed to comply with the Agreement. Having answered "yes" to Question 1, the jury was instructed to answer Question 2, which asked whether Tisdale's failure to comply was excused. The jury was instructed that "[f]ailure to comply by [Tisdale] is excused by [Fairmech's] previous failure to comply with a material obligation of the same agreement." The jury answered, "yes[.]" The court accepted the verdict of the jury and based on the jury's findings, entered final judgment that Fairmech take nothing by its suit. Fairmech filed a motion for new trial wherein it argued the evidence was legally and factually insufficient to support the jury's answer to Question 2. Fairmech's motion for new trial was denied by operation of law. Fairmech timely appealed.

## II. Burden of Proof and Standards of Review

The jury found that Tisdale's failure to comply with the Agreement was excused by Fairmech's previous failure to comply with a material obligation of the Agreement. Fairmech had the burden of proof on its breach of contract claim. *See*

4

*Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). Tisdale, as the party asserting that it should not be held liable for breach of contract, had the burden to plead and prove the elements of a prior material breach. *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied).

In a legal sufficiency challenge, we examine the record in the light most favorable to the judgment and consider whether the evidence at trial would enable a reasonable and fair-minded jury to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When a party challenges the legal sufficiency of the evidence relative to an adverse finding on which it did not have the burden of proof, the party must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a party's legal sufficiency challenge only if the record demonstrates that (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. The fact finder is the sole judge of witness credibility and the weight to give witness testimony. *Id.* at

819. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id*. at 807, 827.

When considering circumstantial evidence that favors the verdict, we review each piece of circumstantial evidence in light of all known circumstances and not in isolation. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 621 (Tex. 2014). If the circumstantial evidence, when viewed in light of all the known circumstances, is equally consistent with either of two facts, then neither fact may be inferred; however, if the circumstantial evidence is not equally consistent with either of two facts, and the jury's inference is within the "zone of reasonable disagreement," we cannot substitute our judgment for that of the trier of fact. *Id*.

In evaluating a factual sufficiency challenge, we consider and weigh all of the evidence, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). We will "set aside the verdict only if the evidence that supports the finding is so weak as to make the verdict clearly wrong and manifestly unjust." *City of Austin v. Chandler*, 428 S.W.3d 398, 407 (Tex. App.—Austin 2014, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). The jury is the sole judge of the witnesses' credibility as well as the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

6

Because neither party challenges the wording of the jury question at issue or the accompanying instruction, we will measure sufficiency of the evidence against the questions as submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

### III. Breach of Contract

On appeal, Fairmech contends the overwhelming weight of the evidence demonstrated that Fairmech performed its contractual obligations. A breach of contract occurs when a party to the contract fails to perform an act that it has promised to perform. *See Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 765 (Tex. 2014); *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The parties do not dispute that the Agreement was valid and binding and do not contend that the Agreement is ambiguous. We conclude that legally and factually sufficient evidence supports the jury's finding that Fairmech failed to perform and thus breached the Agreement.

Regarding Fairmech's performance of the Agreement, the jury heard testimony from five witnesses: Lloyd Tisdale, Jerry Hill, Ramesh Kapur, Madhu Malhortra, and Bharad Bhushan. Lloyd Tisdale, the president of Tisdale at all times relevant to the issues in this dispute, testified that he received invoices from

7

Fairmech, but he did not receive any documents to verify the accuracy and legitimacy of the charges contained therein. He testified that he never received any time sheets, daily logs, service reports, or other documentation from Fairmech, Hyundai, or Daewoo indicating when Fairmech was at the platforms or what Fairmech did while present. He testified that he asked Fairmech to help get supporting documentation from Daewoo and Hyundai to validate Fairmech's invoices and to confirm that Fairmech's performance was satisfactory. Lloyd testified that he repeatedly asked Fairmech, Daewoo, and Hyundai for documentation to verify Fairmech's work. Lloyd stated that at the time of trial, he still had received no documentation to support that Fairmech actually performed the commissioning work it agreed to do in the Agreement.

Lloyd acknowledged sending a facsimile to Fairmech on February 23, 1996. The 1996 facsimile, signed by Lloyd, states:

> Your recent fax messages requesting for release of payment against the commissioning services provided by your company on SHG, NQP, NPC, and SHW platforms in Bombay-High is acknowledged.
>
> The invoices for payment were forwarded to both Daewoo and Hyundai Corporations and are still under their review. We are working very diligently with these companies for an early release of payment. However, we assure you to pay you promptly on receipt of our payment from both Daewoo and Hyundai.
>
> In the meantime, we also request you to exert some pressure on their offices located in Bombay, India which might be instrumental in

8

seeking an early release of payments. If need arises, you may also request ONGC to intervene. We appreciate your patience and hope you will kindly bear with us for a few more days. We shall keep you posted of any developments that take place.

We are also attaching the correspondence that we exchanged between our office and those of Daewoo and Hyundai.

According to Lloyd, the 1996 facsimile was not an admission of the debt, but rather it merely informed Fairmech that Tisdale had received the invoices and forwarded them to Daewoo and Hyundai for review. Lloyd admitted that he personally never put anything in writing to Fairmech indicating that Tisdale needed more documentation to support the charges, but he explained that there were telephone conversations on this subject and probably other writings that addressed the document deficiency.

Lloyd acknowledged that Fairmech sent laborers to the platforms. However, according to Lloyd, the laborers Fairmech sent were unable to do the commissioning work. According to Lloyd, Tisdale never received anything from Fairmech indicating that Fairmech's laborers were qualified to do the work as promised in the Agreement. Ultimately, it was Lloyd's belief that Fairmech was unable to complete the commissioning work as required by the Agreement. Lloyd chose not to ask Fairmech to send substitute workers to the platforms because he

9

believed he was not required to do this under the Agreement[3] and that Fairmech should have sent qualified laborers out to do the work the first time.

Regarding the last invoice at issue for pre-commissioning work, we note that the parties did not include the original invoice as evidence, but rather submitted a demand letter reflecting the invoice amount. The demand letter provides very little description of the work Fairmech allegedly provided, stating simply, "Precommissioning of HVAC System." Lloyd testified that based on the scant information he received from Fairmech for this invoice, he was unable to determine what project this charge was in reference to, how many laborers allegedly worked on the project, or how many days or hours the laborers worked.

Jerry Hill testified that the first time he interacted with Fairmech was when he went to work on the Daewoo project. Hill testified that he performed the pre-commissioning work on the Daewoo project, which took place in Korea. He recalled that he later returned to the Daewoo platform to commission the HVAC system. When he arrived, Hill saw two Fairmech employees, but observed that they had done nothing towards commissioning the HVAC system. He asked the Fairmech employees to help him start commissioning the system and realized that

---

[3] Paragraph A, subpart (13) of the Agreement provides "Fairmech shall substitute any personnel on advice of Tisdale's supervisor, if desired. The replacement shall be provided at no cost to Tisdale within three days."

they did not have the proper safety equipment, did not have any tools to work with, and were not qualified to do the work. Hill called Lloyd and informed him that he was sending the Fairmech employees home and would do the job without Fairmech if Fairmech could not send qualified laborers. According to Hill, the Fairmech employees left the platform and he commissioned the HVAC system without them.

Hill testified that he also did the pre-commissioning work on the HVAC system for the Hyundai project without Fairmech. Hill did not see any Fairmech employees on the platform when he went out to commission the HVAC system. He testified that he commissioned this system without Fairmech's help.

Ramesh Kapur testified on behalf of Fairmech. He testified that he worked for Tisdale for almost twelve years. He was the project manager on both the Daewoo and Hyundai projects, and, as such, he was responsible for dispatching the commissioning teams to pre-commission and commission the HVAC systems. Kapur described Jerry Hill as having "absolutely no qualifications" and testified Hill could "barely read and write." Kapur recalled that Hill was incapable of filling out a logbook properly. Kapur claimed that Hill's limitations caused Tisdale to seek out "qualified, educated people to do this work." Kapur testified that Hill contacted Kapur and told him he needed help on the jobs. According to Kapur,

11

when he was unable to find someone to do the work at a cost Tisdale could afford, Tisdale suggested he contact Fairmech. Kapur testified that he contacted Fairmech and asked Fairmech to submit a proposal to do the commissioning work on the platforms.

Kapur stated that he never received any complaints regarding Fairmech's work. In fact, it was Kapur's belief that Daewoo, Hyundai, the owner of the platforms, the engineers, and the consultants were all "very happy and pleased with [Fairmech's] performance."

Kapur acknowledged that when he first received the invoices from Fairmech, the invoices did not include time sheets, so he stopped payment on the invoices. He testified that when Fairmech contacted him seeking payment, he told Fairmech to send the time sheets, and that Fairmech responded by forwarding all of the time sheets to him. According to Kapur, once he received the time sheets, he informed Lloyd, and then turned the invoices over to Tisdale's accounting department for payment. Kapur testified that he discussed Fairmech's invoices with Lloyd and that Lloyd told him that as soon as Tisdale received payment on the projects, it would release payment to Fairmech. Kapur testified that the 1996 facsimile was Lloyd's explanation to Fairmech that Tisdale was expecting payment on the projects and would make payment to Fairmech shortly.

12

Madhu Malhotra testified that she is one of five partners at Fairmech. According to Malhotra, she never received written notice that there were problems with the invoices she sent Tisdale. She admitted that Tisdale asked Fairmech to send a time sheet and logbook sheets to support the charges in the invoices. She testified that she responded to this request and sent the time and logbook sheets to Tisdale, Daewoo, and Hyundai. According to Malhotra, she did not retain a copy of the time or logbook sheets. However, Malhotra qualified her testimony by stating that her husband, who was not present at trial, was in possession of some of the documents. Malhotra did not specify what documents her husband allegedly possessed, and there is no indication in the record that Fairmech produced these documents to Tisdale.

It was the opinion of Malhotra that the 1996 facsimile Tisdale sent to Fairmech acknowledged Tisdale's indebtedness to Fairmech and indicated that Tisdale would pay the debt as soon as Tisdale received payment from Daewoo and Hyundai. The fax even requested Fairmech to pressure Daewoo and Hyundai to pay Tisdale.

On cross-examination, Malhotra agreed that the Agreement required Fairmech to provide competent and skilled technical personnel to perform the commissioning work on the platforms. She testified that Fairmech complied with

13

the Agreement and provided competent and qualified workers for the Tisdale platform projects. She asserted that she provided Tisdale with written documentation regarding her employees' qualifications. When asked whether Fairmech had documentation to show to the jury indicating that Fairmech employees were in fact degreed and qualified, Malhotra responded, "[t]hese people already left and [they] are not with my company anymore, so I cannot show them."

Malhotra also acknowledged that the Agreement required Fairmech laborers to carry all necessary tools and other equipment to accomplish the commissioning work. She acknowledged that Fairmech agreed to have its logbooks verified each day by either a Tisdale employee or someone from Daewoo or Hyundai.

Malhotra admitted that she was not present on any of the platforms and did not observe Fairmech laborers completing any of the work. When asked if Fairmech had any documentation that when Fairmech employees left the Daewoo platform, the HVAC system had been commissioned, Malhotra responded, "I can't recall."

The jury also heard deposition testimony from Bharad Bhushan. Bhushan was the vice-president of Fairmech. He admitted that Fairmech kept records of its business transactions. He recalled that Fairmech did three jobs for Tisdale. The same "skilled labor[ers]" went out to each of the three jobs. He testified that the

laborers maintained a logbook and time sheets, which they had certified by the client and by a Tisdale representative. The Fairmech laborers would send the certified sheets to the Fairmech office. He testified that other persons in his office maintained these records.

Bhushan identified the invoices for the work performed on the Hyundai and the Daewoo projects. Bhushan testified that the invoices accurately reflect the work performed because that is what his laborers reported doing and Hill signed off indicating the same. He testified that Fairmech's last invoice sought payment for commissioning an HVAC system, which he claims was part of one of the other jobs. Bhushan testified that he never personally went out to any of the projects, and that all of his knowledge stems from what his employees reported on their time sheets for work they performed on the platforms. Bhushan testified that Tisdale never contacted Fairmech to indicate there was any problem with the invoices submitted or to complain about any work performed by Fairmech.

The jury heard extensive testimony regarding the familial relationship between Kapur and three members of Fairmech's partnership. The jury heard testimony that Kapur eventually left Tisdale's employment under strained circumstances. If believed, this testimony was sufficient to cause the jury to question the credibility of Fairmech's witnesses.

15

Contrary to Kapur's testimony, Lloyd testified that Kapur was the first person to approach Tisdale about hiring Fairmech. According to Lloyd, he did not know that Kapur's brother and sister were partners at Fairmech until after this litigation began. He explained that he only became suspicious of Kapur after Kapur demonstrated an abnormal level of pressure and attention to paying Fairmech's invoices. When confronted, Kapur was offended and denied any relationship to Fairmech. According to Lloyd, because of the mounting conflict, Kapur left Tisdale's employment. Lloyd testified that when this litigation began, he tried to find his files on Fairmech and they were missing.

Kapur admitted that Malhotra is his sister and Bhushan is his brother. Malhotra admitted that her husband, Ravi Malhotra, is also a partner. While Kapur's familial relationship with Fairmech is not disputed, Kapur claims Tisdale knew the nature of his relationship in 1994. When Bhushan was asked how Fairmech came into possession of certain Tisdale documents and whether he received the documents from Kapur, Bhushan responded, "No knowledge. No." When pressed further, he responded, "I can't comment." He eventually testified that he did not know how Fairmech came into possession of the documents. Kapur claims he left Tisdale's employment in 1996 because he was asked to do something unethical.

16

In summary, the jury heard testimony from Hill indicating that Fairmech failed to send qualified laborers to perform the commissioning work at the platforms, and as a result, Hill actually did the commissioning work. The jury also heard Lloyd testify that Hill had extensive experience in the field and that Lloyd trusted Hill's opinion. Based on all of the circumstances, Lloyd determined that Fairmech was unable to provide the services it had promised under the Agreement—i.e., qualified laborers to perform the commissioning work. Fairmech countered Lloyd and Hill's testimony with testimonial evidence that it provided qualified workers to perform the work on the platforms and that they performed the work called for in the Agreement. However, other than voicing very general opinions regarding its laborers' qualifications, Fairmech produced no other evidence to corroborate the testimony. None of the witnesses who testified on behalf of Fairmech had been out to a platform or observed Fairmech's laborers doing any of the work. No Fairmech witness could testify to any personal knowledge of the laborers' qualifications. The jury, as the sole judge of the credibility of the witnesses, was free to believe Hill's testimony that Fairmech sent unqualified workers without the proper tools and safety equipment and failed to perform the work called for under the Agreement. The jury was also free to find that Fairmech's witnesses were not credible in their dispute of Hill's testimony.

17

Fairmech was unable to provide proper documentation that its laborers actually performed the work reflected in the invoices. Lloyd testified that Tisdale repeatedly tried to obtain documentation from Fairmech and from the other general contractors to support Fairmech's charges. Lloyd testified that he never received any documentation. While Fairmech's witnesses testified that Fairmech sent Tisdale the proper documentation, they claimed they failed to retain copies of the documentation and had no documentation to back up their claims. The jury was free to believe Lloyd's testimony that he never received supporting documentation and disbelieve the testimony offered by Fairmech. Fairmech has not established that the jury could not have made credibility determinations in Tisdale's favor and against Fairmech on these matters or that the jury could not have resolved the conflicting evidence in favor of Tisdale.

In reviewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence is sufficient to show that Fairmech did not send qualified laborers to the Daewoo platform to commission the HVAC system, and the laborers Fairmech did send did not have the proper tools to accomplish the task. The evidence is also sufficient to show that Fairmech employees did not commission the HVAC system on the Hyundai platform. Whether Fairmech employees actually went to the Hyundai platform is immaterial; the Agreement

provided for qualified laborers to commission the HVAC system, and Hill testified that he commissioned that system without the help of Fairmech employees. Specific to the third invoice, the evidence is sufficient to show that Fairmech did not provide pre-commissioning work on either the Daewoo or Hyundai project. Bhushan testified that the third invoice reflected additional work on either the Daewoo or Hyundai project. However, Fairmech failed to provide any supporting documentation for these charges. For all three invoices, the evidence is sufficient to show that Fairmech failed to produce supporting documentation for the alleged work. We conclude the evidence is legally sufficient to support the jury's finding that Fairmech breached the Agreement. Fairmech relies heavily on the 1996 facsimile to support its contention that it properly performed its obligations under the Agreement. However, reasonable jurors, considering all known circumstances, could resolve the contents of the facsimile in Tisdale's favor and conclude that the facsimile only acknowledged receipt of Fairmech's invoices and informed Fairmech that once Daewoo and Hyundai reviewed the invoices and remitted payment to Tisdale, Tisdale would in turn pay Fairmech for any work properly performed under the Agreement. Reasonable jurors could conclude that the facsimile did not amount to an admission of debt or acknowledgement that Fairmech's performance was in accordance with the Agreement. In considering all

of the evidence in support of and contrary to the jury's finding, we conclude the evidence is factually sufficient to support the jury's verdict in that the evidence in support of the finding is not so weak as to make the verdict clearly wrong and manifestly unjust.

## IV. Materiality of Breach

Tisdale contends that Fairmech materially breached the Agreement by failing to provide qualified laborers to commission the HVAC systems and in failing to provide any proper documentation to verify any work allegedly performed under the Agreement. We note Fairmech does not address whether any alleged breach was a breach of a material term of the Agreement. We conclude the evidence is legally and factually sufficient to support the jury's finding that Fairmech breached a material term of the Agreement by failing to provide qualified laborers to complete the commissioning work.

A defense asserting that a prior material breach excused another's obligation under a contract is an affirmative defense to a breach of contract claim and, as such, it must be affirmatively pleaded. *Compass Bank*, 152 S.W.3d at 852; *see generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (referring to prior material breach as an affirmative defense to a contract claim). "It is a fundamental principle of contract law that when one party to a contract

commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004). The covenant breached must be part of mutually dependent promises to excuse the nonbreaching party's performance. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). "Whether a party's breach of contract is so material as to render the contract unenforceable is a question of fact to be determined by the trier of fact." *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). We consider the following factors in our determination of whether a party's failure to perform is material:

> (1) the extent to which the injured party will be deprived of the benefit that it reasonably expected;

> (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

> (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;

> (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing;

21

*See Mustang Pipeline*, 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)). In determining when a party's duties are discharged under a contract due to the other party's material breach, in addition to the factors identified above, we consider:

> (1) the extent to which it reasonably appears to the injured party that delay may prevent or hinder the injured party from making reasonable substitute arrangements; and

> (2) the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not of itself discharge the other party's remaining duties under the agreement unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

*Id*. (citing RESTATEMENT (SECOND) OF CONTRACTS § 242). The less the non-breaching party is deprived of the expected benefit of the contract, the less material the breach. *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).

Fairmech's failure to provide qualified laborers capable of commissioning the HVAC systems goes to the very heart of Tisdale's expected benefit under the Agreement. As a result of this breach, Tisdale had to employ Hill to perform the commissioning work with help of other laborers already stationed on the platforms. As indicated above, there is evidence in the record that Hill, not Fairmech, provided both the pre-commissioning and commissioning work on both the Hyundai and Daewoo platforms. The Agreement, written by Fairmech, states, "We

22

have been contacted by your Mr. Jerri Hill for providing the manpower[ ]to commission the air-conditioning system supplied by your esteemed corporation on ONGC's project." Whether Hill contacted Fairmech or Kapur, it is clear from the first sentence of the Agreement drafted by Fairmech that Fairmech is aware that Tisdale's expected benefit under the Agreement is for Fairmech to provide the commissioning work on the platforms. The first general provision in the Agreement provides that "Fairmech shall provide competent and skilled technical personnel, qualified to undertake commissioning work." The only compensation contemplated in the Agreement is compensation for engineers, described as qualified degree holders, and skilled and technical mechanical, electrical, and instrumentation personnel.

In view of the factors presented in *Mustang Pipeline*, we conclude the record supports the jury's finding that Fairmech's breach in failing to provide qualified laborers was material and therefore excused Tisdale's obligation to pay the invoices at issue. *See Mustang Pipeline*, 134 S.W.3d at 199. The evidence at trial showed that Tisdale was deprived of the main benefit it reasonably expected under the Agreement—qualified laborers to perform commissioning work on the platforms. Clearly, Tisdale's promise to pay Fairmech for commissioning the HVAC systems was dependent on Fairmech actually commissioning the HVAC

23

systems. Thus, the evidence is legally and factually sufficient to support the jury's finding that Tisdale's failure to comply with the Agreement was excused by Fairmech's previous failure to comply with a material obligation of the Agreement. Accordingly, we overrule Fairmech's two issues on appeal and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on January 6, 2015
Opinion Delivered November 25, 2015

Before Kreger, Horton, and Johnson, JJ.