# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00509-CV

**Tom Marek, Appellant**

**v.**

**R. L. Lehrer, Appellee**

## FROM THE DISTRICT COURT OF SAN SABA COUNTY, 424TH JUDICIAL DISTRICT
## NO. 9464, HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Tom Marek appeals from the trial court's final judgment in favor of R. L. Lehrer following a jury trial. After hearing claims for breach of a cattle grazing lease and violation of the Deceptive Trade Practices-Consumer Protection Act (DTPA), the jury returned a verdict finding Marek liable on both claims and awarding actual damages, including lost profits, and additional exemplary damages. Lehrer elected to recover under the DTPA, and the trial court rendered judgment on the verdict accordingly. On appeal, Marek does not contest liability for breach of contract. Instead, Marek argues the trial court erred by awarding additional DTPA damages because there is no evidence supporting the jury's DTPA findings and additional DTPA damages are not available for mere breach of contract. Marek also argues there is no evidence supporting the jury's lost profits finding. Because we conclude legally sufficient evidence supports the jury's findings, we affirm the trial court's final judgment.

## I. BACKGROUND

At trial, the jury heard evidence concerning a cattle grazing lease dispute between Lehrer and Marek and subsequent actions taken by the parties related to the lease. Lehrer, a cattle rancher, lives on a 438 acre ranch in San Saba County—the same place he lived when he was born in 1945—and grazes thirty or so cows there. Before this lawsuit, Lehrer also grazed nineteen or so cows half a mile from his ranch on a 257 acre property (the Property) that his family has owned since the 1930s. Lehrer testified that he usually gets "a calf out of every cow because the bull is in [the Property] year-round." As Lehrer's counsel explained at oral argument, "[w]e are really in the business of growing forage and grass, which is converted to beef, and then sold as our ultimate product."

Having neither children nor siblings, Lehrer decided to sell the Property, lease the Property back to continue his cattle grazing, and live off of and travel with the money from both the sale of the Property and the yearly profits received from auctioning the calves born to the grazing cattle. After posting the Property on Craigslist in May 2014, Lehrer received an email expressing interest from Marek, who lives in Austin. Marek visited the Property with his family and verbally agreed with Lehrer that Lehrer would sell the Property for $200,000 down and carry an $800,000 note for five years at 3% interest with no payment required on principal for the first five years, while Marek would lease the land back to Lehrer for grazing and hunting. Lehrer testified that he expected to live off of the $24,000 in yearly interest on the note and the $10,000 or more per year he thought he would make from grazing cattle on the leased Property. Although Lehrer received another offer

to buy the Property for $100,000 more than asking price and 4% instead of 3% interest, Lehrer refused, saying he had made a deal with Marek. He told Marek of this offer before signing papers.

On June 9, 2014, the parties entered into a Farm and Ranch Contract for the verbally agreed upon terms. The contract included a Special Provisions Addendum, which, among other things, contained the following provision:

4.    Seller and Buyer agree that at closing, Seller shall lease the Property from Buyer for grazing purposes for the sum of $2,500 per year for a period of five years. The lease will be payable annually in advance, with the first payment of $2,500 being due at closing and the payments for each succeeding year of the lease term being due on the anniversary date of closing.

Marek's ex-wife Mary, a lawyer, represented Marek in signing the contract.

In the days leading up to the August 21, 2014 closing, Lehrer proposed a single paragraph grazing lease that mirrored the terms used in the Special Provisions Addendum. Marek testified that he told Mary that Lehrer's proposed lease was "a piece of shit" and there was "no way in hell" he was going to sign it. Marek instead had Mary prepare an alternative draft lease to propose at closing. Initially, Mary prepared a draft lease that included a five year term, but provided lessor with a 180 day notice termination right. Marek responded to Mary that he did not like this lease because it was "long and complicated" and that she should prepare another lease. At trial, Mary testified that "there were certain things that [Marek] said to change, but I don't -- it wasn't an issue with the term." Mary then prepared a shorter draft lease, which had a one year term with the possibility for renewal for another year, but provided both lessor and lessee with a ninety day notice termination right. She testified that "the reason that those two provisions are different is really just

3

it was based on a different form [lease]" and "I changed [the proposed lease term]. You're absolutely right. I did, but that could have been talked about between the parties and negotiated and we could have fixed that." When presented with this draft on the closing day, Lehrer, whose lawyer had a family emergency and was unable to attend closing, said he was not going to sign it until his lawyer had a chance to look at it.

With neither party signing the proposed draft leases at closing, Marek and Lehrer instead signed a document that stated: "The provisions in the Farm and Ranch Contract regarding R. L. Lehrer's rights to lease the property described on Exhibit A, attached hereto, for Grazing and Hunting shall survive the closing." Marek testified that he interpreted this document as meaning "that we had some unfinished business and that a lease was to be negotiated in its entirety." With closing finished, Lehrer provided Marek with the deed to the Property. Lehrer's cattle on the Property prior to closing continued to graze on the Property after closing.

In the next few months, Marek may have presented to Lehrer another draft lease that Mary prepared.[1] Like Marek's previous draft lease presented at closing, this draft lease had only a one year term instead of the five year term, but it also shortened the ninety day notice termination right in the previous draft to only thirty days and provided this right only to lessor, not both lessor and lessee. Once again, Mary testified that in preparing the draft lease "I really don't remember there ever being -- anybody saying that it should be one year, not five years, so that's probably just, honestly, a mistake in the document," and the thirty day notice termination right was because of "a

---

[1] Testimony at trial is unclear whether the draft lease was actually transmitted. Mary testified that she "gave [the draft lease] to Tom [Marek] to look at and I am assuming he gave it to R.L. [Lehrer] to look at." Marek was unsure whether he actually gave it to Lehrer.

form of a lease that I was using as a starting point for R.L. [Lehrer] and Tom [Marek] to negotiate a lease that they would both be willing to sign." Lehrer and Marek did not discuss another proposed lease agreement until December 2014.

In December 2014, Lehrer told Marek he was going to close the water gap between the Property and a neighboring property. Lehrer and his neighbor to the Property initially built a game proof fence between the properties, but kept a water gap that allowed deer and hogs, but not cattle, to cross. Lehrer had promised the neighbor that he would close the water gap when he sold the property so that the neighbor could keep sheep on his property. Lehrer had told Marek that was a possibility when they discussed buying the Property. When Lehrer finally told Marek he was going to close the water gap, Marek said he wished Lehrer would not, but Lehrer responded that he had already told the neighbor he would close it, and that is what he was going to do. Marek was upset with that response.

A few days later, Lehrer was clearing brush on the property when Marek approached him with a check for $11,500. The $11,500 represented the $24,000 in interest on the note Lehrer owned minus $10,000 in credit for hunting rights and $2,500 in credit for grazing rights. Although the money was not due until August, Marek said he wanted to "get it off income tax this year." At that time, Marek also handed Lehrer another draft lease and Lehrer responded "I'll read it when I get a chance, or read it when I get home." This draft lease once again had a one year term instead of a five year term, but the notice requirement to terminate was shortened from thirty days in the previous draft to only seven days and remained solely the prerogative of lessor, not lessee. Finally, Marek

5

provided a receipt that listed the amount of interest and credits and asked Lehrer to sign it, which both parties did. Marek took the only copy of the receipt with him.

When the receipt was presented to the jury at trial and admitted into evidence, the receipt had two paragraphs discussing the hunting and grazing credits that were typed below the signature lines. The paragraph on the grazing credit read "Credit for grazing = $2,500 this is subject to Maker and Holder entering into a mutually acceptable grazing lease. If no lease is entered into, Holder agrees to remove all cattle within 5 days of notice from Maker." Lehrer testified that there were no paragraphs included below the signature lines and that the grazing credit paragraph "wasn't on that paper when I signed it that day." Marek, on the other hand, testified that the paragraphs were on the paper when Lehrer signed it.[2]

On December 19, 2014, Marek emailed Lehrer's attorney complaining that Lehrer would not sign a lease agreement and had too many cattle grazing on the Property. He insisted that by "5:00 P.M. TODAY" he needed proof Lehrer had signed the cattle lease, otherwise he would remove "ALL of the cattle tomorrow." Lehrer's counsel responded that Lehrer has "19 cows, 1 bull, and their offspring" on the Property and he was running the cattle grazing "in the same manner his family has operated the land for over 75 years." He said that he and Lehrer would be happy to meet

---

[2] The trial record reflects discussion regarding why the margins of the two paragraphs below the signature line did not line up with the margins of the body text on the receipt. In explaining the creation of the document, Marek testified that he initially said in a deposition that he prepared the receipt in a Word document. But in searching his computer after the deposition, he could not find the document—he alleged that he did not save a computer file of it: "I made this document, printed it, closed it." He then testified that he misstated at his deposition that it was a Word document; rather, it was an Excel file. He had copied the language from Google and "pasted that text language onto that Excel spreadsheet," and that might be the reason why the margins did not line up.

with Marek after Christmas during the first two weeks of January to "negotiate a settlement of this matter" and that Lehrer "has expressed an interest in cutting ties with you, and I'm guessing that is what you want as well." He also explained that there was already a written agreement to lease the land from the closing documents and that Marek had "even accepted the lease money."

On January 6, 2015, Lehrer closed the water gap between the Property and the neighboring property. While at home in Austin, Marek saw images transmitted from his gaming cameras on the Property of Lehrer closing the water gap from the neighboring property's side of the fence. Marek promptly called the San Saba County Sheriff's Office to complain that Lehrer was trespassing. In the phone call, which was recorded and played for the jury, Marek referenced the receipt with the cattle grazing paragraph on it and said that "when [Lehrer] signed that receipt" there was a clause on that receipt that "clearly states" that "the lease will be engaged in within 7 days of receipt of this payment" or "the cows will be removed immediately." Marek also mentioned that "I don't know if R L [Lehrer] realizes this[.]"

The next day, Lehrer went to the Property to feed his cows and testified that he discovered Marek was locking the cattle up in a four acre turnip patch with little access to water and in freezing temperatures. Lehrer asked Marek, "What in the hell are you doing?"; Lehrer responded, "I want to close these cattle up in here and you're going to have to get them off." According to Lehrer, Marek, in the process of locking the cows up, separated some baby calves from their mothers, at least two and maybe three of the calves died, and Lehrer had to climb over the fence to care for his cattle for several days. At that point, Lehrer got a court order to take the cattle off the Property and he removed them to his 438 acre ranch. Because his ranch was already stocked with

cattle, he testified that "[i]t became necessary to sell some cattle." So Lehrer sold some of his older

cows on his ranch and replaced them with the young cows he removed from the Property.

Lehrer then sued Marek for breach of the cattle grazing lease and violating the DTPA

by committing deceptive and unconscionable acts. Marek brought multiple counterclaims, including

a breach of contract claim based on the alleged agreement included in the paragraph on the receipt

below the signature line, which Lehrer testified was not there when he signed it. At trial, Marek

nonsuited all his counterclaims except breach of contract.

During a three day trial, the jury heard from both Lehrer and Marek and their

witnesses regarding their competing accounts of the events related to the lease dispute.[3] The jury

found in favor of Lehrer and made the following relevant findings: (1) Marek engaged in a false,

misleading, or deceptive act relied upon by Lehrer that was the producing cause of Lehrer's damages;

(2) Marek knowingly engaged in an unconscionable action that was the producing cause of Lehrer's

damages; (3) Marek failed to comply with the agreement that Lehrer would lease the Property from

Marek for grazing at $2,500 a year for five years; (4) Lehrer would be fairly and reasonably

compensated with $2,695.41 in out of pocket expenses and $45,982.85 in lost profits; (5) Lehrer

should be awarded $50,000 in additional damages because Marek's conduct was committed

knowingly; and (6) Marek and Lehrer did not agree that Lehrer would remove all cattle within five

days of notice from Marek if they did not enter into a mutually acceptable lease. After receiving the

---

[3] In addition to Lehrer and Marek, the jury heard from Mary Marek, Lehrer's neighbor to the Property, and Lehrer's expert on damages Joe Ellis as part of Lehrer's case-in-chief; and from Marek's expert on leases Michael Martin. Counsel for both parties also testified regarding attorney's fees.

jury verdict, Lehrer elected to recover under the DTPA and Marek moved for judgment notwithstanding the verdict (JNOV) and to disregard jury findings. The trial court rendered judgment consistent with the jury verdict, awarding Lehrer $48,678.26 in compensatory damages and $50,000 as additional damages under the DTPA, and denying Marek's motion for JNOV. After moving for a new trial, Marek appealed the final judgment to this Court.

## II. ANALYSIS

On appeal, Marek has narrowed his arguments. For purposes of this appeal, he no longer disputes the jury's breach of contract finding. Nor does he contest the jury's finding related to his breach of contract counterclaim that there was no agreement made by the additional paragraph located below the signatures on the receipt. Instead, Marek raises the following three issues: (1) no evidence supports the jury's finding of a DTPA violation; (2) this case concerns merely a breach of contract violation, not a DTPA violation, and therefore additional damages under the DTPA are improper; and (3) no evidence exists that Marek's conduct caused the lost profits under either the DTPA violation or breach of contract theory. Marek challenges only the legal sufficiency of the evidence, not the factual sufficiency.

In response, Lehrer argues that the evidence shows Marek never intended to comply with the lease, which is an actionable DTPA violation and more than mere breach of contract. Alternatively, Lehrer asserts that the evidence shows Marek committed unconscionable or false, misleading, and deceptive acts subsequent to signing the lease. Finally, Lehrer points to the testimony of his expert witness Joe Ellis and his own corroborating testimony as supporting the jury's lost profits determination.

9

After noting the standard of review, we first consider the DTPA issues and then review the lost profits issue.

## A. Standard of Review

To sustain a legal sufficiency challenge, the record must show "(1) . . . a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017) (quoting *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016)). In reviewing a legal sufficiency challenge, we consider all evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, disregarding contrary evidence unless reasonable jurors could not, and indulging every reasonable inference deducible from the evidence that supports the verdict. *Id.* at 456; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Importantly, however, we do not substitute our judgment for the jury's; instead, because "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony," we defer to the jury's credibility determinations if reasonable. *City of Keller*, 168 S.W.3d at 819. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

**B. The DTPA Issues**

As relevant here, the DTPA, *see* Tex. Bus. & Com. Code §§ 17.41–17.63, provides consumers with a cause of action for either a false, misleading, or deceptive act or practice relied upon by the consumer and specifically enumerated in the "laundry list" included in section 17.46; or an unconscionable act. *Id.* § 17.50(a)(1), (3); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). A DTPA claim may overlap with other causes of action, including breach of contract. *See PPG Indus. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004) (citing *Amstadt*, 919 S.W.2d at 649). However, "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (quoting *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983)).

The purposes of the DTPA are to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection," and the Legislature has mandated that the DTPA "shall be liberally construed and applied to promote its underlying purposes[.]" Tex. Bus. & Com. Code § 17.44(a). The Texas Supreme Court has noted that the DTPA "does not represent a codification of the common law" and that "[a] primary purpose of the enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit." *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980). Consistent with these purposes, "DTPA claims generally are also punitive rather than remedial," and the DTPA permits recovery of treble damages

11

for knowing or intentional violations. *PPG Indus.*, 146 S.W.3d at 89 (citing Tex. Bus. & Com. Code § 17.50(b)(1)). Thus, the DTPA is often pleaded "not because it is the *only* remedy, but because it is the most *favorable* remedy" and its important role "is the remedies it *adds*, not the ones it *duplicates*." *Id.* (citing Tex. Bus. & Com. Code § 17.43).

### 1. Intent

The jury found that Marek engaged in a "false, misleading, or deceptive act," which the charge defined to include "[r]epresenting that real property leased for use had or would have characteristics that it did not have" and "[r]epresenting that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law[.]" Citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006), Marek agrees with Lehrer that DTPA damages are recoverable in a contract case like this one if "the defendant did not intend to perform on the contract at the time the contract was made," but disputes that legally sufficient evidence supports the requisite intent.

Intent is a fact question "uniquely within the realm of the trier of fact" because it depends so heavily on the credibility of witnesses and the weight given to their testimony. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 880–81 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.). "[A] party's intent is determined at the time the party made the representation." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (quoting *Spoljaric*, 708 S.W.2d at 434). But "[p]roving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Id.* at 774–75

12

(quoting *Tony Gullo*, 212 S.W.3d at 305). Thus, a party's intent "may be inferred from the party's subsequent acts after the representation is made." *Id.* at 775 (quoting *Spoljaric*, 708 S.W.2d at 434).

### 2. Evidence of Intent

As described above, although breach of contract alone is insufficient to demonstrate that a party did not intend to perform, a breach of contract combined with "slight circumstantial evidence" of fraudulent intent is "some evidence of fraudulent intent, enough to support a verdict." *Id.* (quoting *Tony Gullo*, 212 S.W.3d at 305). It is undisputed that Marek breached the cattle grazing lease—Marek does not contest this jury finding. Thus, we must decide whether there is "slight circumstantial evidence" that Marek did not intend to perform the cattle grazing lease at the time of the representation. "Circumstantial evidence" is "simply indirect evidence that creates an inference to establish a central fact." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding). In reviewing the record for any "slight circumstantial evidence," we must keep in mind that "[e]ven if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess." *City of Keller*, 168 S.W.3d at 821. Thus, we must "assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences" in our legal sufficiency review. *Id.*

We conclude that there exists at a minimum "slight circumstantial evidence" for the jury to infer that Marek did not intend to perform the agreement by providing Lehrer with a full five years to lease the Property when he represented to Lehrer that "at closing, Seller shall lease the Property . . . for a period of five years" and that this provision "shall survive the closing." We turn now to such evidence.

13

We begin by considering the draft leases Marek prepared. Marek admitted at trial that he "never submitted to R.L. Lehrer a lease for five years" and he "never submitted a lease to [Lehrer] that didn't give [Marek] the right to terminate it before the five years is up[.]" In fact, Lehrer was the only party that presented a draft lease with a five year term, which mirrored almost verbatim the terms of the Special Provisions Addendum. But Marek said there was "no way in hell" that he would sign the draft lease that he called "a piece of shit." And Marek's ex-wife Mary testified that "Marek was never willing to sign that lease," even though she noted that it had the "exact same terms" as the Special Provisions Addendum—"the same price, the same term, and that it would be paid annually." Marek also admitted he had the option to discuss with Lehrer and add terms to the Special Provisions Addendum, including indemnification and grazing restrictions, before closing. Instead, knowing that Lehrer had received a better offer to buy the Property, Marek represented that he "shall lease the Property" back to Lehrer "for a period of five years" and at closing Marek represented that this term would survive closing, which the jury concluded constituted a binding lease. However, Marek admitted that after closing he was "operating under the belief that no lease had been entered" and that Lehrer would be a trespasser at "any point that he was on the land after I owned it" because "[t]here was no lease and no willingness to cooperate," thereby effectively denying having made the promise in the representation. *See Mays v. Pierce*, 203 S.W.3d 564, 573 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (noting that "courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise" (citing *Spoljaric*, 708 S.W.2d at 435)). Crediting the evidence, a jury could reasonably infer from (1) Marek's knowledge that Lehrer had received a better offer for the Property, (2) Marek's refusal

14

to sign Lehrer's draft lease, (3) Marek's belief that no lease had been entered, and (4) Marek's assertion that Lehrer was a trespasser after closing, that Marek had no intent to comply with the terms that he represented would survive closing unless he was able to negotiate a lease that added to—or even changed—the terms beyond what was already agreed upon.

Moreover, indirect evidence also supports the inference that Marek did not want a five year term at closing. Of Marek's four draft leases, only one had a five year term—and that draft still provided Marek with the right to terminate the lease in less than five years with 180 days' notice. Nevertheless, when Mary presented the five year term lease she drafted, it is undisputed that Marek rejected this lease and never presented it to Lehrer; instead, Marek asked Mary to prepare another draft lease. Mary testified that she used a different template form to prepare the next draft, and this resulted in a draft with only a one year term. Marek argues that the only reasonable inference given the context, including different document identifier numbers on the two draft leases, is to conclude that Mary changing the term from a five year term to a one year term "when using the new template was an oversight[.]" Perhaps it would not be unreasonable for the jury, as the sole judge of the credibility of the witnesses and the weight of the witnesses' testimony, to conclude Mary may have made a mistake if these were the only two draft leases at issue. But the conclusion that this is the *only* reasonable inference is belied by the fact that Marek's next two draft leases, which bear no resemblance to the templates of the first two draft leases, also had a term of only one year. *Cf. City of Keller*, 168 S.W.3d at 821 (noting in discussion of conflicting inferences that "in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes" and in another case "jurors may infer that relatives tore down

15

posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them").

Given the fact that every subsequent lease prepared by Mary had a one year term instead of a five year term and Marek never offered Lehrer a lease with a five year term, a jury could have reasonably inferred that at least one of the reasons Marek asked Mary to change the draft lease was to provide a shorter term than five years. Although Mary testified that "there were certain things that [Marek] said to change, but I don't -- it wasn't an issue with the term," "jurors are the sole judge of the credibility of the witnesses and the weight to give their testimony." *Id.* at 819. Thus, the jurors could have chosen to disregard her testimony and inferred that Marek intended to lease the property for less than five years—notwithstanding his representations that he would lease Lehrer the Property for five years—especially given the subsequent lease drafts that were also for one year terms. *See id.* at 820 (noting that "[j]urors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses" and that "an architect's uncontradicted testimony that he relied on a 20-year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties").

Marek argues that his compliance with the lease from day one until he breached the lease a few months later shows that at the time of closing he intended to comply with the lease and that Lehrer's "argument had to become more nuanced, i.e., that Marek's secret intent *at closing* was to lease the land to Lehrer for grazing, but for less than five years." But this "more nuanced" argument still represents an intent to not comply with the lease. Marek contests this "more nuanced" argument by asserting that Lehrer never raised any complaints regarding "the temporal terms in the

16

various forms of draft leases Marek proposed." However, whether or not Lehrer objected to or even noticed the temporal terms included in the draft leases does not preclude the jury from inferring based on "slight circumstantial evidence" that Marek intended to shorten the agreed upon lease term. At issue here is Marek's intent, not Lehrer's awareness of Marek's intent.

The inference regarding Marek's intent is further supported by the fact that with each successive draft, the termination period became shorter. When asked whether she "intentionally" put the termination provision in the draft lease, Mary's response was "most leases have some termination provision." Before closing, the termination provision in the draft leases was shortened from 180 days to ninety days; after closing, the termination provision in the draft leases was further shortened from thirty days to seven days. In fact, the last two drafts are almost identical besides the express change from thirty to seven days. The jury could have reasonably rejected Marek's explanation that this express change was a mere "oversight" based upon a template change. The evidence is that Marek continuously attempted both before and after closing to provide a mechanism to permit him to perform less than the represented five year term for the lease.[4]

Finally, the jury made a finding regarding the receipt that Lehrer argues Marek altered, which further supports the inference regarding Marek's intent at closing. Even though the signed receipt had additional paragraphs below the signatures permitting Marek to "remove all cattle

_____

[4] Marek argues that his position "was always transparent and clear; he wanted a written grazing lease that covered all the standard lease terms." But the fact that he wanted a written grazing lease does not imply what terms he wanted in that lease, or indicate his intent to comply with a lease. The jury could have reasonably inferred from his draft leases that he wanted a written grazing lease that provided less than the agreed upon five year term, and the testimony regarding his actions both at closing and after provides circumstantial evidence that he never intended to comply with the full five year term promised and would have rejected any lease that had the full five year term.

17

within 5 days of notice" if the parties do not enter into a mutually acceptable lease, the jury nevertheless found that no agreement was created. Marek argues that the altered receipt is "indicative only of Marek's complete exasperation that he had not been able to get a lease signed, not that he never had any intention of complying with an agreement" and "[a]t most it could demonstrate an attempt to avoid liability for potential breach of a lease, not an initial intent to not comply." Marek also argues "it is nonsensical that [Marek would] continue to let Lehrer run his cattle and continue approaching Lehrer and his attorney over months with the singular purpose of obtaining a written grazing lease," if his intent at closing was not to comply with the lease. But these arguments ignore the fact that with each subsequent draft lease, the notice requirement for termination became shorter, including the almost identical final two draft leases that shortened the notice requirement from thirty to seven days. If Marek was concerned only with "get[ting] a lease signed," one would reasonably expect the notice requirement to at least remain the same, not get more onerous with each subsequent draft.[5] Marek's proposed draft leases, all of which had a one year term and even shorter notice termination provisions, and the actions Marek took to get the cattle

---

[5] The two cases Marek cites to support his position that the altered receipt is only an attempt to avoid liability both concerned misrepresentations that stemmed from or constituted the actual breach of contract. *See Wayne Duddlesten, Inc. v. Highland Ins. Co.*, 110 S.W.3d 85, 92 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (noting misrepresentations "stem from" failure to comply); *Continental Dredging, Inc. v. De-Kaizered, inc.*, 120 S.W.3d 380, 390 (Tex. App.—Texarkana 2003, pet. denied) (noting misrepresentations regarding whether contract had been completed "gave rise only to a breach of contract"). Here, in contrast, the altered receipt preceded the breach and as a subsequent act to the representations made at closing, may constitute circumstantial evidence of a party's intent at the time of the contract. *See Aquaplex Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (noting party's intent "may be inferred from the party's subsequent acts").

18

off his property are not inconsistent with an intention to not comply with the lease at the time of closing; indeed, they support such an intention.

Lehrer cites three cases in which the "slight circumstantial evidence" standard was met. *See Tony Gullo*, 212 S.W.3d at 304–06; *Spoljaric*, 708 S.W.2d at 434; *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 208 (Tex. App.—Austin 1998, pet. denied). Marek attempts to distinguish these three cases factually. But even if those cases are not entirely analogous here, as is often the case in these fact-intensive inquiries, they do not provide authority for why the evidence in this case does not meet the "slight circumstantial evidence" standard.[6] Instead, the only case Marek cites in support of his position regarding his intent is *Mays*, 203 S.W.3d at 573–74. In *Mays*, the plaintiff Pierce argued that although the defendant Mays contracted to restore Pierce's home and its contents after toxic mold was discovered, Mays and the company Pro-Tech never intended to perform at the time of the contract. *Id.* at 573. Pierce pointed to Mays's testimony that Pro-Tech would have performed remediation if it had been paid for it, which it was not, and it was paid for "content packout," not remediation—but the court summarily dismissed this testimony as no evidence of an intent not to comply at the time of the contract. *Id.* The court also noted that Mays testified that there was no contract to rebuild the house, but concluded that when read in context Mays was merely contending Pro-Tech was not paid to rebuild, not that Pro-Tech never agreed to perform the work. *Id.* Thus, the court held that the evidence was "so weak that it creates only a

---

[6] Marek implies that *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006), requires "egregious circumstances to clear this high hurdle." We disagree that the "*slight* circumstantial evidence" standard enunciated in *Tony Gullo* requires either "egregious circumstances" or constitutes a "high hurdle" to support a jury's verdict.

suspicion of Pro-Tech's lack of intent to perform," and therefore was legally insufficient to support a DTPA claim. *Id.* at 574. Here, in contrast, the evidence at the time of the contract and after closing creates more than mere "suspicion," as shown above. We conclude that *Mays* does not control here, nor have we found any case indicating that the evidence here creates only a "suspicion" instead of "slight circumstantial evidence" of intent to not perform.

In sum, we conclude that at least "slight circumstantial evidence" exists that Marek never intended to provide Lehrer with the five year term promised both before and at closing on the Property. The evidence and the testimony of the witnesses demonstrated that Marek: (1) made these promises with knowledge that Lehrer had been provided a better financial offer than his; (2) rejected the five year term draft lease that Mary had prepared; (3) refused to sign the five year term draft lease Lehrer prepared; (4) proposed a one year term at closing; and, after closing, (5) prepared and proposed subsequent drafts for only a one year term with shorter and shorter notice requirements to terminate the lease. Further, the jury could have reasonably inferred from the evidence that Marek altered the receipt to provide him with the ability to effectively evict Lehrer, thereby accomplishing his intent at closing. We conclude the evidence satisfies the "slight circumstantial evidence" standard enunciated in *Tony Gullo* and *Spoljaric*, and when combined with Marek's breach, is legally sufficient to support the DTPA verdict. *See Tony Gullo*, 212 S.W.3d at 305–06; *Spoljaric*, 708 S.W.2d at 435–46. Because the evidence supports "more than a mere breach of contract," the trial court did not err in awarding additional damages as exemplary damages under the DTPA. *See*

20

*Tony Gullo*, 212 S.W.3d at 306; *see also* Tex. Bus. & Com. Code § 17.50(b)(1) (providing for recovery of up to three times economic damages if conduct violating DTPA was committed knowingly).

### 3. Evidence of Unconscionable Act

Even if we were to conclude that Marek did not have the requisite intent, we would nevertheless conclude that legally sufficient evidence supports the jury finding that Marek committed an unconscionable act, which independently supports the award of additional damages under the DTPA. *See* Tex. Bus. & Com. Code § 17.50(a)(3); *see also Teague v. Bandy*, 793 S.W.2d 50, 54 (Tex. App.—Austin 1990, writ denied) ("A consumer may maintain a DTPA cause of action for unconscionable conduct even if the seller made no specific misrepresentations."). The DTPA defines "[u]nconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). Applying the ordinary meaning of "gross," the Texas Supreme Court has noted that "[t]aking advantage of a consumer's lack of knowledge to a grossly unfair degree thus requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985). The statute also requires the unconscionable action to be the "producing cause" of the damages. Tex. Bus. & Com. Code § 17.50(a).

Lehrer argues that it was unconscionable for Marek to "[c]riminally alter[] a legal document and us[e] that as grounds for eviction[.]" Crediting the evidence, the jury could have reasonably inferred that Marek took advantage of Lehrer by using Lehrer's signature on a document

21

to serve as an agreement to propositions favorable to Marek that were not initially included on the receipt when Lehrer signed it, and that Lehrer had a "lack of knowledge" of what Marek would be including on the document that Lehrer was signing. *Id.* § 17.45(5). Moreover, we also agree that altering a legal document and then using the added language as grounds for eviction results in a "glaringly noticeable, flagrant, complete and unmitigated" unfairness.

Marek's only argument against the jury's finding of an unconscionable act is that Lehrer "fails to connect how Lehrer 'relied to his detriment' on language allegedly added to a receipt he claims he never saw[.]" But, unlike the "deceptive" prong of the DTPA, the statute does not require "reliance" to support a finding of unconscionability, nor did the jury charge include a reliance element. *Compare* Tex. Bus. & Com. Code § 17.50(a)(1)(B) (including reliance element for deceptive prong) *with id.* § 17.50(a)(3) (omitting reliance element for unconscionability prong); *see also Mays*, 203 S.W.3d at 572 ("A plaintiff need not prove reliance to establish a claim based on unconscionability."). Although reliance is not required, the unconscionable action must be the producing cause of the damages. *See* Tex. Bus. & Com. Code § 17.50(a). The "producing cause" standard "requires proof that the act was a substantial factor in bringing about the injury, without which the injury would not have occurred." *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835 (Tex. 2009). Marek did not expressly challenge the producing cause element, but even if he had, Marek testified that he used the altered receipt as the "basis" for "penning those cattle up" and that he "put heavy reliance" on the receipt when he "told the sheriff that that's why he had to get the cattle off," which was consistent with the transcript of Marek's call to the sheriff. Legally sufficient evidence supports the jury's finding that Marek's action was the producing cause of the damages.

22

We therefore conclude the evidence is legally sufficient to support the jury's finding that Marek committed an unconscionable action, and the trial court did not err in awarding additional damages under the DTPA on this basis. *See* Tex. Bus. & Com. Code § 17.50(a)(3) (providing for a DTPA cause of action for an unconscionable act); *id.* § 17.50(b)(1) (providing for recovery of up to three times economic damages if conduct violating DTPA was committed knowingly). We overrule Marek's issues related to the DTPA and turn to his issue regarding lost profits.

## C. The Lost Profits Issue

As his final issue, Marek challenges the legal sufficiency of the evidence supporting the jury's lost profits damages finding. At trial, Lehrer's expert Ellis testified that: (1) Lehrer would "generally run" on the leased Property "about 19 cows and one bull" with a thirteen acre per animal unit stocking rate; (2) it would cost $451 per animal unit per year to graze cattle on the leased Property based on a line item expenses breakdown; (3) calves born to the grazing cattle would sell for $950 based on past sales records at auctions; (4) subtracting expenses from the sale price yields a $499 profit from the sale of each calf each year; (5) "if the 19 cows produce 19 calves, you've got $9,481 per year" in profits; (6) but because "you hardly ever sell 100 percent calf crop every year," a "conservative" 3% death loss should be subtracted to yield $9,196.57 in net profits per year; and (7) multiplying the yearly net profits by the five year term of the lease equals $45,982.85 in lost profits. Marek does not contest the qualifications of the expert, the bases of these numbers, or the actual calculations.[7] Instead, Marek asserts that there is no evidence that Marek's conduct *caused*

---

[7] In his reply brief, Marek criticizes Ellis's calculation of multiplying the yearly net profits by five years: "the lost-profits model is based on five years, even though Lehrer's cattle remained

any lost profits—i.e., because Lehrer moved the cattle from the Property without selling the cattle, he may not have suffered any overall lost profits to his business operations as he did not present evidence that his other properties could not support the moved cattle. We disagree.

As we recently noted, "lost profits, by definition, must be *profits*—the net of income or revenues from a business activity less the expenses incurred in that activity[.]" *Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 665 (Tex. App.—Austin 2017, no pet.). Ellis calculated exactly that: he took the net past and future income from grazing cattle on the leased Property less the past and future expenses for grazing cattle on the Property for the term of the lease. Ellis also testified that the cows that were grazing on the Property were young cows and would still be "in their productive years" five years later—i.e., for the duration of the lease; thus, no replacements would be needed. Because it is undisputed that Marek prevented Lehrer from grazing his cattle on the Property, Lehrer lost the profits from that business activity.[8] In other words, Lehrer established "a direct causal link between the lost-profits damages, the actions of the defendant, and

on Marek's property for over four months as Marek endeavored to get a lease signed as contemplated at closing." But this argument was neither raised to the trial court nor in Marek's opening brief and fails to specifically respond to any matter in the appellee's brief. Marek has therefore waived this complaint. *See* Tex. R. App. P. 38.3 ("The appellant may file a reply brief addressing any matter in the appellee's brief"); *McFadden v. Olesky*, 517 S.W.3d 287, 293 n.3 (Tex. App.—Austin 2017, pet. denied) ("Ordinarily, an argument asserted for the first time in a reply brief is waived and need not be considered by an appellate court.").

[8] Marek appears to claim that Lehrer needed to analyze the lost profits in the context of "Lehrer's overall cattle operations" and provide testimony regarding Lehrer's overall operations, including "how many total acres were available to Lehrer for grazing, how many animal units each location could sustain, and how many units were at each location when the units on Marek's property were moved." We find no support in the law for Lehrer's assertion.

24

the injury suffered." *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Marek's claim to the contrary appears to rest on confusion regarding Lehrer's lost profits calculation. Marek argues that Lehrer completely failed "to link the claimed harm (the selling of cows) to Marek's conduct (ending the lease)" and that "Lehrer himself even testified that the cows he sold, on which his lost profits calculation is based, were not the cows removed from the Marek property but were older cows from multiple properties within his operation." But Lehrer's lost profits calculation was neither based on the sale of the nineteen cows that were grazing on the Property and later removed nor on the sale of the cows Lehrer replaced with the cattle from the Property; the calculation was based on the expenses associated with and availability of the leased Property to graze cattle that would produce a calf crop for sale. As Ellis explained, "the property that was in question, that's what [Lehrer] stood to make off of it had everything stayed the same. You know, that's what I'm looking at."

Marek argues that under *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992), Lehrer must "explain to the jury why cattle could not have been redistributed among all the land he had leased at the time." In *Holt*, the Heines sued when Holt refused to honor an oral warranty on a bulldozer, but kept possession of the bulldozer. *Id.* at 82. After Holt failed to appear, the trial court entered a default judgment and awarded $120,000 in lost profits, based on Mr. Heine's testimony that their 1985 income tax return—a tax return from a preceding year before Holt took possession of the bulldozer—showed profits of about $120,000 from two bulldozers operating at half time due to slow business. *Id.* at 83, 85. The *Holt* Court noted "[a]pparently the trial judge

determined that one bulldozer working full-time would earn as much in thirteen months as two bulldozers working half-time would earn in twelve months," but found this analysis flawed because "the Heines never offered any evidence showing that there was enough work to keep two bulldozers working full-time over the relevant thirteen month period." *Id.* at 85. Accordingly, the *Holt* Court concluded the evidence was legally insufficient. *Id.*

We disagree that *Holt* supports Marek's argument. In contrast to the Heines, Lehrer presented "one complete calculation" based on "objective facts, figures, or data" to determine the lost profits from the business activity at issue—i.e., grazing cattle on the leased Property—not merely the total profits of his business operations with no analysis to determine the lost profits. *See id.* at 84, 85 (recognizing that calculations of lost profits must be based on "objective facts, figures, or data" and recovery "must be predicated on one complete calculation"). Moreover, Lehrer presented evidence showing that the lease was being utilized by the cattle for grazing purposes when the breach occurred; the cattle would be productive during the life of the lease; and no cows would need to be purchased to replace the cattle during the life of the lease. The facts here are not analogous to a bulldozer being taken out of commission for a time period with uncertainty regarding whether it would have been otherwise utilized during that time to produce profits. Marek's reliance on *Holt* is inapposite here.

Finally, although Marek denies that he is making a mitigation or offset claim, he appears to be arguing that Lehrer should have mitigated damages by finding other grazing land for the cows after removing them from the leased Property. To the extent Marek's argument could be construed as a mitigation or offset claim, we note that the burden of proof lies with Marek. *See ERI*

26

*Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010) ("[T]he defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credits."); *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997) ("The traditional rule . . . is that the breaching party must show that the nonbreaching party could have reduced its damages."); *Pinson v. Red Arrow Freight Lines, Inc.*, 801 S.W.2d 14, 16 (Tex. App.—Austin 1990, no writ) ("The burden of proof with respect to whether the plaintiff failed to mitigate and the extent to which his failure to mitigate caused or increased the damages, is upon the party who caused the loss."). Marek failed to present evidence supporting a mitigation or offset claim; in fact, Marek failed to present any evidence at all to counter Ellis's testimony.[9] We therefore conclude the trial court did not err in rendering judgment in accordance with the jury's verdict on lost profits and overrule Marek's final issue.

### III. CONCLUSION

Having concluded that legally sufficient evidence supports the DTPA and lost profits findings, we affirm the district court's final judgment.

---

[9] Although the record shows that Lehrer testified that he sold some cows at his ranch and replaced them with the cows that were grazing at the Property, Lehrer also testified that it takes "[a] whole lot more" to "run cattle on your own land that you own" than "it does if you lease it." As Lehrer explained, if land that you own is worth $3,000 per acre—and the evidence showed that the Property price was $3,800 per acre—then it takes around a $40,000 investment to raise a calf on thirteen acres. In contrast, Ellis testified it costs $125 per year—or $625 for the five year term of the lease—to lease the thirteen acres of the Property on which to raise a calf. Thus, the mere fact that Lehrer moved cows to his ranch after Marek prevented him from grazing his cattle on the leased Property fails to constitute evidence satisfying Marek's burden of proof regarding Marek's entitlement to mitigation or offset, had Marek even raised those claims.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   November 29, 2018